# DAVID ESSER, ET. AL.

# AFFIDAVIT IN SUPPORT OF ARREST WARRANTS, CRIMINAL COMPLAINTS, SEARCH WARRANTS, AND SEIZURE WARRANTS

# Table of Contents

I.    **Introduction** ................................................................. 2

Agent Background ............................................................ 2

The Execution of Search Warrants and the Conduct of Drug Traffickers ........................ 4

Crypto/Digital Currency ............................................................ 7

II.    **Purpose** ................................................................. 13
Arrest Warrants and Criminal Complaints ................................................ 13

Search Warrants ............................................................ 14

Seizures of Bank Accounts ............................................................ 14

Seizures of Motor Vehicles ............................................................ 15

III.    **Summary** ............................................................ 19
The Target Offenders ............................................................ 19

Esser ............................................................ 20

Nieves ............................................................ 22

McLaughlin and Alison ............................................................ 24

IV.    **Probable Cause** ............................................................ 25
The North Carolina Investigation ............................................................ 25

The Mansfield Massachusetts Investigation ............................................................ 30

Trash Pulls at the Subject Premises ............................................................ 30

Trash Pulls at Subject Premises #1 ............................................................ 31

Trash Pulls at Subject Premises #2 ............................................................ 38

Subpoena of United Parcel Service records ............................................................ 46

Mailings ............................................................ 49

Postal Click n Ship records ............................................................ 59

Undercover Purchase of Steroids from Esser ............................................................ 60

V.    **Seizure Warrants** ............................................................ 72
Bank Accounts used for Drug Trafficking ............................................................ 72

Target Account #1 ............................................................ 73

Transfers between Target Account #1 and Target Account #3 ............................ 79

Transfers between Target Account #1 and Target Account #4 ........................... 84

Transfers between Target Account #1 and Target Account #5 ......................... 86

Transfers between Target Account #1 and Target Account #2 ........................... 90

Other York, PA Properties ............................................................... 93

Cryptocurrency activity ............................................................... 99

Purchase of Target Vehicles using Proceeds from Target Accounts ................. 100

Esser's Tax Returns ..................................................................... 104

Other Anonymous tips .................................................................. 106

Esser's Newest Residence, Subject Premises #4 ......................................... 107

**VI.    Computers, Electronic Storage, and Forensic Analysis** .................... 111

**VII.   Conclusion** ...................................................................... 125

**AFFIDAVIT**

I, Brendan Cullen, do under oath depose and state that:

## I.    INTRODUCTION

*Agent Background*

1.    I am a Special Agent with the Department of Homeland Security (DHS) United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) assigned to the Boston Field Office. I have been employed by HSI and its predecessor, the U.S. Customs Service since January of 2003. I am currently assigned to the Port Investigations Group. Prior to my assignment to the Boston Field Office, I was assigned to the HSI Providence Field Office where I served as the Resident Agent-in-Charge. Before that, my post of duty was at HSI Headquarters in Washington, D.C. where I served as the Program Manager and the Deputy Chief of Staff for ICE. I have also worked at HSI Philadelphia Field Office in several different investigative groups. In connection with my official duties, I have investigated and assisted other agents in investigating numerous cases involving a wide variety of criminal violations including, but not limited to, drug investigations, fraud, intellectual property rights and export enforcement investigations. As a Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States and thereby authorized to request the issuance of federal arrest, search

and seizure warrants.

2.     During my tenure as a Special Agent, I have been responsible for many illicit drug, smuggling, and money laundering related investigations. I have been the affiant on numerous warrants and wiretap applications. I have conducted extensive physical and wire surveillance, executed numerous search warrants, reviewed and listened to taped drug conversations, and analyzed drug ledgers maintained by traffickers. I have also interviewed numerous users and distributors of illicit drugs. Therefore, I am thoroughly familiar with the manner in which illegal drugs are imported and distributed, the method of payment for drugs, and the efforts of persons involved in drug trafficking activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and launder drug proceeds. In the same way, I am thoroughly familiar with the vernacular of the drug trade, common codes and jargon.

3.     Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to: "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug transactions; and use cellular telephones to facilitate their drug distribution operations. I also know that drug trafficking is an illicit business and an ongoing process requiring the development, use and protection of a communication network to facilitate daily drug distribution. Drug dealers use various methods to thwart law enforcement detection, including frequently

3

changing cellular phones and vehicles, using various aliases, and using coded communications. Based on my experience in drug investigations, I know that drug traffickers frequently refer to illicit drugs in guarded conversations and frequently use code words when referring to controlled substances or money.

4.      The facts and information contained in this affidavit are based on my personal involvement in this investigation, my training and experience, the training and experience of technical experts, business records, information stored in public and law enforcement databases, as well as information reliably obtained from employees of the United States Postal Service, law enforcement officers of the Alamance County North Carolina Narcotics Enforcement Team, the Mansfield Massachusetts Police Department, the North Attleboro Massachusetts Police Department, Special Agents of the Food and Drug Administration, Inspectors of the United States Postal Inspection Service, other HSI Special Agents from the Boston, Providence, Houston and Winston-Salem Field Offices and the Internal Revenue Service (IRS).

*The Execution of Search Warrants and the Conduct of Drug Traffickers*

5.      Based upon my training and experience and my participation in this investigation, I know that:

a.  Drug traffickers often place assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually own or use these assets and exercise dominion and control over them. Records

4

relating to these assets are frequently found in their residences and other locations controlled by them.

   b.   Persons involved in drug trafficking use their vehicles, residences, and businesses, to conceal controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or the proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring secreting, or spending money made from engaging in drug trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

   c.   Drug traffickers often carry, on their person or maintain in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

   d.   Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, and cellular telephones that reflect names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code. These types of records are sometimes maintained in computers, cellular telephones or other electronic data storage devices. Records and electronic devices of this sort are also frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

e.   Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property. Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of drug traffickers, and provide valuable evidence of conspiratorial relationships. Records of this type are sometimes in hard copy are but are increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

f.   Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses or other locations controlled by them. That drug paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers all of which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs. Large-scale drug traffickers sometimes use money-counting machines to help count and sort the proceeds of drug trafficking.

g.   Drug traffickers commonly consign controlled substances to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in locations where traffickers have ready access to them, including on their person or in their residences, vehicles, businesses, smart telephones, tablets and personal computers.

6

Drug traffickers also normally maintain these items and records for long periods of time, regardless of whether their value to the drug dealer has diminished.  Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer.  Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

   h.  Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence which list their names and addresses in that residence, such as, personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing and other articles of personal property that would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence. Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that store data electronically.

*Crypto/Digital Currency*

   6.     "Cryptocurrency" (also known as "digital currency") is generally defined as an electronically sourced unit of value that can be purchased with, sold for, or used as a substitute for fiat currency (i.e., currency created and regulated by a government).

7

bitcoin ("BTC") is a type of cryptocurrency. Cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Cryptocurrency is not illegal in the United States.

7.        Most verified and confirmed cryptocurrency transactions are recorded in a public ledger (i.e., a "blockchain"); it is not maintained by a single administrator or entity. Individuals can acquire cryptocurrencies like bitcoin through, for example, exchanges (i.e., websites that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies), ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." As an example, an individual mines bitcoin by allowing his/her computer to run special software that uses the computer's power to verify transactions by solving the transaction's embedded algorithm. The Miner who is first to solve the algorithm is paid the miner fees for that transaction. As more transactions are approved, they are recorded into the aforementioned public ledger until the block is full. At this time, the network conducts a special lottery. Only the Miners who received Miner fees for that block are eligible to win. After the lottery winner is picked, newly minted bitcoin are deposited into that Miner's wallet and a new block is created. This is how new bitcoin are entered into the bitcoin economy. Individuals also can send and receive cryptocurrencies through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be performed on any device that can access the internet, i.e.: computers, smart phones and gaming consoles. Even though the public addresses of those engaging in

8

cryptocurrency transactions are recorded on a public ledger, the true identities of the individuals or entities behind the public addresses are not recorded on the public ledger. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. As an example, bitcoin transactions are described as "pseudonymous," meaning that they are partially anonymous. And, while it's not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

8.      Users store their cryptocurrencies in digital "wallets[1]," which are identified by unique electronic "public addresses." A wallet essentially stores the access code that allows an individual to conduct cryptocurrency transactions on that cryptocurrencies' network. To conduct these transactions, an individual must use a wallet or "private key" and a public address (or "public key"). A cryptocurrency address is somewhat analogous to an email address and is represented as a case-sensitive string of letters and numbers. Each cryptocurrency wallet contains a private key, which acts as a digital verification of ownership. Only the holder of the private key can authorize any transfers of digital currency from that address to other addresses. This is similar to someone signing a check. Cryptocurrencies are legal but have been known to have been exploited by cybercriminals for money-laundering purposes. It should be noted that the

---

[1] Technically, cryptocurrency wallets do not store cryptocurrencies. Rather, the wallet provides the tools necessary to interact with the Blockchain; the wallets generate the necessary information to send and receive cryptocurrency via Blockchain transactions.

cryptocurrency bitcoin is the primary means of payment for illegal goods and services

operating on "Dark Net Marketplaces (DNM)" or other "dark web" sites operating on

the Tor network.[2] By maintaining multiple digital currency wallets, those who use

bitcoin and other cryptocurrencies for illicit purposes can attempt to thwart law

enforcement's efforts to track purchases within the Dark Net Marketplace.

9.      Cryptocurrency wallets can also be backed up into, for example, paper

printouts, USB drives, or CDs, and accessed through a "seed phrase" (random words

strung together in a phrase, also known as a "recovery phrase") or a complex password.

Additional security safeguards for cryptocurrency wallets can include two-factor

authorization (such as a password and a phrase). I also know that individuals

possessing cryptocurrencies often have safeguards in place to ensure that their

cryptocurrencies become further secured in the event that the cryptocurrencies become

potentially vulnerable to seizure and/or unauthorized transfer.

10.     "Digital Currency Exchangers" (DCE) are individuals or companies that

exchange digital currencies for other currencies (both other digital currencies or fiat

currencies, like the U.S. dollar.) According to the Financial Crimes Enforcement

Network (FinCEN) Guidance issued on March 18, 2013, individuals who act as

exchangers of digital currencies, such as bitcoin for Fiat currencies such as the U.S.

dollar, are considered money transmitters. They are required to register with FinCEN

and have proper state licenses (if required by the state) in accordance with 31 C.F.R.

---

[2] Tor is a free open source software enabling anonymous communication on the internet.

§ 1022.380. Registered money transmitters are required by law to follow Bank Secrecy Act anti- money laundering regulations, "Know Your Customer" ("KYC") protocols and other verification procedures similar to those employed by traditional financial institutions. For example, registered exchangers often require users who want to open or maintain accounts on their exchange to provide their name, address, phone number and the full bank account and routing numbers that the user links to his/her exchange account. Registered exchanges can charge exchange fees as low as 1-2% for converting bitcoin to U.S. currency. As a result, there is significant market demand for anonymous bitcoin-to-dollar exchanges, from illicit exchangers who have no AML or KYC procedures (and often advertise, to the contrary, their "stealth" and "complete customer anonymity"). These exchangers often advertise their services on dark web marketplaces, and "sell" customers U.S. currency (i.e., cash shipped in the mail) in exchange for cryptocurrency, with none of the anti-money laundering protections that exist in the traditional banking system. These illicit exchangers are often able to charge a higher exchange fee, often as high as 9-10%, because customers are willing to pay for greater financial secrecy and no anti-money laundering compliance.

11.     Some companies offer a cryptocurrency wallet service that allows users to download a digital wallet application onto their smart phone. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive and transfer cryptocurrencies via the application. Many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are

11

stored on the device on which the application is installed (or any backup created by the user). As a result, these companies cannot assist in seizing or otherwise restraining cryptocurrencies stored in these "non-custodial wallets," although they provide the wallet technology to their users. However, some of these companies do not provide the wallet's private key or seed phrase to their clients and thus are an exception and do have complete access to their users' funds. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone or other digital device housing the wallet, accessing the wallet and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the "seed phrase" for a wallet (see above), it may be able to use the seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

12.     It should be noted that because **ESSER**'s crimes involved the use of virtual currency, the items to be seized could be stored almost anywhere within a premise or a person, in both physical and electronic formats.  For example, Attachment B seeks cryptocurrency public keys or addresses, cryptocurrency private keys, cryptocurrency root keys, and passwords.  These pieces of data comprise long and complex character strings, and in the training and experience of HSI agents, many virtual currency users write down or otherwise record and store such items because they are too long to commit to memory.  As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a premise.  For all of the

12

foregoing reasons, your affiant respectfully submits that probable cause exists to believe that such records, data, and documents will be found within the subject premises or on ESSER's person, including in computers or on other devices that store electronic data.

II.      PURPOSE

*Arrest Warrants and Criminal Complaints*

13.      This affidavit is being submitted in support of Arrest Warrants for:

- David Esser, who was born in the year 1973 and whose last known address is 9 Fisher Street, Apartment 3, North Attleboro, MA. (**ESSER**);

- Mason Nieves, who was born in the year 1992 and whose last known address is 164 Parade Street, Apt. 1, Providence, RI. (**NIEVES**);

- James McLaughlin, who was born in the year 1986 and whose last known address is 41 Eddy Street, North Attleboro, MA. (**MCLAUGHLIN**); and

- Alison Esser, a/k/a Alison Shephard who was born in the year 1979 and whose last known address is 41 Eddy Street, North Attleboro, MA. (**ALISON**).[3]

14.      The Applications for Arrest Warrants are based on Criminal Complaints charging them with: possession with intent to distribute Schedule III and IV Controlled Substances; conspiracy to distribute, possess with intent to distribute and conspiracy to import Schedule III and IV Controlled Substances; manufacturing and distributing Schedule III and IV Controlled Substances; importation of Controlled Substances into

---

[3] I will refer to Alison Shepard as **ALISON**, to distinguish her from David Esser because they share a common surname. **ALISON** is **ESSER**'s former spouse.

the United States; trafficking in counterfeit goods and services; smuggling goods into the United States; as well as wire fraud and money laundering, all in violation of 21 U.S.C. § 841(a)(1), § 846 and § 952; 18 U.S.C. §§ 2320, 545, 371, 1343, 1956 and 1957. (Target Offenses).

*Search Warrants*

15.     This affidavit is also being submitted in support of an application for Search Warrants under Rule 41 of the Federal Rules of Criminal Procedure for the Subject Premises described more fully in this affidavit and in Attachment A:

- **ESSER**'s residence located at 9 Fisher Street, Apartment 3, North Attleboro, MA 02760[4] (Subject Premises #1);

- **ESSER**'s stash house located at 145 North Washington Street, Apartment 7, North Attleboro, MA 02760 (Subject Premises #2);

- **ESSER**'s Post Office Box 620, located at the Mansfield Post Office, 12 Giles Place, Mansfield, MA 02048-0620 (Subject Premises #3); and

- **ESSER's** second residence located at 74 Oakhurst Street, Unit A, North Attleboro, MA 02760 (Subject Premises #4).

The Applications request authority to search for evidence of the Target Offenses as more fully described in in this affidavit and in Attachment B.  The Applications also

---

[4] According to North Attleboro Electric Department, **ESSER** has paid utilities at 9 Fisher Street, #3 since January of 2013.

request authority to seize all funds, including cryptocurrencies, in the possession or control of **ESSER** and in the subject premises.

*Seizures of Bank Accounts*

16.     Also, I make this affidavit in support of applications for seizure warrants for the following Target Accounts more fully described in this affidavit and in Attachment C:

    a.  All funds on deposit in Bank of America checking account number xxxx xxxx 0100, held in the name of David M. Esser (Target Account #1);

    b.  All funds on deposit in Bank of America checking account number xxxx xxxx 9446, held in the name of Esser Properties, LLC (Target Account #2);

    c.  All funds on deposit in Bank of America checking account number xxxx xxxx 3040, held in the name of Mason Angel Nieves (Target Account #3);

    d.  All funds on deposit in Bank of America checking account number xxxx xxxx 6833, held in the name of Regiane De Moraes Delesposti (Target Account #4);

    e.  All funds on deposit in Bank of America checking account number xxxx xxxx 2144, held in the name of Ana P. Menezes (Target Account #5);

    f.  All funds on deposit in Bank of America savings account number xxxx xxxx 9775, held in the name of Ana P. Menezes (Target Account #6);

    g.  All funds on deposit — including cryptocurrencies — owned or controlled by **ESSER** and stored in or accessible via any phone or other digital media device owned or controlled by **ESSER,** currently located in the District of Massachusetts.

*Seizures of Motor Vehicles*

17.     Finally, I make this affidavit in support of applications for seizure

15

warrants for the following Target Vehicles more fully described in this affidavit and in
Attachment D:

    a. A blue 2017 Chevrolet Corvette, registered to David M. Esser, Date of Birth:
       xx/xx/1973, 74 Oakhurst Street, Unit A, North Attleborough, MA 02760,
       bearing MA registration 1DAA34 and Vehicle Identification Number (VIN)
       1G1YH2D78H5110011;

    b. A white 2019 Toyota Camry, registered to David M Esser, Date of Birth:
       xx/xx/1973, 74 Oakhurst Street, Unit A, North Attleborough, MA 02760,
       bearing MA registration 6GW891 and VIN 4T1BZ1HK2KU024687;

    c. A black 2016 BMW X6 SUV, registered to Regiane Vieira, Date of Birth
       xx/xx/1987, 9 Fisher Street, Apt 3, North Attleborough, MA 02760, bearing
       MA registration 9EX366 and VIN 5UXKU2C55G0N83531;

    d. A black 2016 Nissan Rogue registered to Alison R. Esser, Date of Birth:
       xx/xx/1979. 4 Towne Street, North Attleborough, MA 02760, bearing MA
       registration 47A170 and VIN 5N1AT2MVXGC744674;

    e. A gray 2015 Toyota Camry registered to Regiane Celi Delesposti[5], Date of
       Birth: xx/xx/1987, 9 Fisher Street, Apt 3, North Attleborough, MA 02760,
       bearing MA registration 1BJE17 and VIN 4T4BF1FKXFR508033.

18.    As set forth in more detail below, I have probable cause to believe that
proceeds from violations of 21 U.S.C. § 841 (Distribution of Controlled Substances), 21
U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), 21 U.S.C. § 952
(Importation of Controlled Substances), 18 U.S.C. § 2320 (Trafficking Counterfeit
Goods) and 18 U.S.C. § 545 (Smuggling Goods Into U.S.), all of which are specified
unlawful activities pursuant to 18 U.S.C. § 1956(c)(7) were deposited into Target

---

[5]This affidavit references **ESSER's** spouse as "Vieira-Esser." However, I have observed several different
spellings of Vieira-Esser's name, including two different variations with the Massachusetts Registry of
Motor Vehicles; Regiane Celi DELESPOSTI and Regiane VIEIRA.

{"}

Account #1, and then transferred to the Target Accounts #2, #3, #4, #5 and #6.

Furthermore, I have probable cause to believe that funds from Target Account #1 were

used directly or transferred to Target Account #2 for the purpose of purchasing the

Target Vehicles as well as for buying and maintaining real estate. In addition, there is

probable cause to believe that the funds from Target Account #1 were also used to pay

**ESSER**'s foreign steroid suppliers (through international wire transfers) and to pay

**NIEVES** (through transfers from Target Account #1 to Target Account #3) for **NIEVES'**

role in the drug trafficking operation. I further have probable cause to believe that the

Target Funds constitute property, real or personal, involved in a transaction or

attempted transaction in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering of

proceeds of specified unlawful activity.[6] Finally, I have probable cause to believe that

the Target Vehicles described as a blue Chevrolet Corvette, a white Toyota Camry, a

black BMW, a black Nisan Rogue and a gray Toyota Camry were directly used to

facilitate the distribution of controlled substances or were purchased using the proceeds

of controlled substances.[7]

     19.    Accordingly, I submit that there is probable cause to seize the funds held

in the Target Accounts described in Attachment C and the motor vehicles described in

Attachment D as they constitute property derived from proceeds obtained, directly or

---

[6] To the extent that any of the listed offenses were completed within one year before the seizure sought by this application, it is not a defense to forfeiture that the funds currently on deposit are not the same funds that were involved in those completed offenses. Pursuant to 18 U.S.C. § 984, the funds currently on deposit are forfeitable to the United States as fungible property in lieu of the funds that were so involved.

[7]  Due to the age and condition of the 2004 tan Toyota Corolla referenced later in this affidavit and driven by **MCLAUGHLN**, this affidavit will not include it as one of the Target Vehicles being sought for seizure.

indirectly, from violations of 21 U.S.C. §§ 841 , 846, and 952 (Controlled Substance

Offenses), 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and Services), 18 U.S.C

§ 545 (Smuggling Goods Into the United States), and/or property used, or intended to

be used, in any manner or part, to commit, or to facilitate the commission of violations

of 18 U.S.C. §§ 841, 846, 952 (Controlled Substance Offenses), 18 U.S.C. § 2320

(Trafficking in Counterfeit Goods and Services), and/or property involved in violations

of 18 U.S.C. §§ 1956-1957 (Money Laundering), and therefore are subject to forfeiture

pursuant to 21 U.S.C. § 853(a) (criminal forfeiture of proceeds and facilitating property

for controlled substance offenses), 21 U.S.C. § 881(a) (civil forfeiture of proceeds and

facilitating property for controlled substance offenses), and 18 U.S.C. § 982(a)(1)-(2)

(criminal forfeiture of proceeds for smuggling goods, wire fraud, and money

laundering offenses), 18 U.S.C. § 981(a)(1)(C)-(D) (civil forfeiture of proceeds in

importation of controlled substance, smuggling goods, money laundering and wire

fraud offenses), 18 U.S.C. § 2323 (criminal and civil forfeiture of proceeds facilitating

property for trafficking counterfeit goods) and 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(A)

(criminal and civil forfeiture of property involved in money laundering offenses).

20.     For the reasons set forth below, I respectfully submit that there is probable

cause to believe that (1) in the event of the conviction of **ESSER, NIEVES,**

**MCLAUGHLIN** and **ALISON**, each of the Target Vehicles and Target Funds will be

subject to forfeiture, and (2) a restraining order under 21 U.S.C. § 853(e) may not be

sufficient to assure the availability of the Target Vehicles and Target Funds for

forfeiture, and therefore, pursuant to 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f), a

18

warrant authorizing the seizure of the Subject Assets should be issued.

21.     The contents of the Target Accounts shall consist of all principal, deposits, interest, dividends, and other amounts credited to the account on and after execution of the warrant up to final liquidation of the account. HSI is seeking authorization, without further order of the Court, to effect the seizure of the contents of the account by, in its discretion, directing the financial institution at which the account is established to do any of the following:

a) To freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than HSI Special Agents, and while any contents of the account are frozen in place to accrue any deposits, interest, dividends, and any other amount credited to the account for a period of up to sixty days from the date of seizure and until HSI Special Agents direct that the contents of the account be finally liquidated and no contents remain;

b) To liquidate some or all of the contents of the account at one or more times at the direction of HSI Special Agents and upon any such liquidation of any contents to turn over the liquidated amount to HSI or their designee. Any such direction of HSI shall be deemed to be the direction of the Court under this warrant.

III.    SUMMARY

*The Target Offenders*

19

22.     Based on the information uncovered during the course of this investigation, I have identified **ESSER**, **NIEVES**, **MCLAUGHLIN** and **ALISON** as being responsible for the distribution of Schedule III and IV Controlled Substances, primarily steroids, as well as other prescription-only pharmaceuticals.[8] I have determined that **ESSER** is the leader of this network of individuals and is responsible for the sale of thousands of units of steroids from at least February of 2015 up to the present date. Furthermore, my investigation established that **NIEVES**, **MCLAUGHLIN** and **ALISON** assisted **ESSER** in this scheme to import steroids from international suppliers primarily based in Hong Kong, repackaged the drugs, and using the United States Postal Service (USPS), distributed them to customers throughout the United States.[9]

*Esser*

23.     **ESSER** has several prior arrests and convictions:

| Date | Offense | Venue | Sentence |
|------|---------|-------|----------|
| 04/23/91 | Retail Theft | PA | Guilty Plea/Fines/Costs |
| 12/17/92 | State Narcotics Violations (1 Misdemeanor/1 Felony) | PA | Serve 6 Months County Probation |
| 07/25/97 | Possession/Distribution of Class D Substance | Wrentham District Court | Suspended Sentence of 6 months |

---

[8] Anabolic steroids, including testosterone, can be obtained via a prescription and have a variety of medical uses. Some individuals, including athletes and bodybuilders, use steroids for cosmetic purposes, such as to enhance muscle development, as well as to performance and recover from injury. There are a variety of laws in the United States that control the use, manufacture, and possession of anabolic steroids.

[9] **ESSER** also previously conspired with Joseph Alvin Patterson to import, manufacture and distribute steroids.

| | (Marijuana) | | |
|---|---|---|---|

24.     ESSER is believed to have been engaged in the sale of steroids over a long

period:

- I am aware, from speaking with a Special Agent (SA) from the Drug Enforcement Administration (DEA), that ESSER was listed as the intended recipient of a seized mail parcel containing approximately 200 methandienone[10] tablets sent from the United Kingdom in 1994. This seized mail parcel was destined for 16 Colonial Way, Plainville, MA, a known previous address for ESSER.

- Furthermore, Agents at the Food and Drug Administration (FDA) have conducted investigations of ESSER in the past. FDA SA Jason Remeka informed me that he and two other law enforcement officers interviewed ESSER on February 3, 2015, after they found a USPS parcel containing testosterone (a controlled substance) in the stream of mail addressed to him at Subject Premises #1. ESSER admitted he ordered the steroids for $200 from a seller he knew through a bodybuilding forum. Agent Remeka did not arrest ESSER for that offense and he is believed to have continued his steroid trafficking business following this and other encounters with law enforcement.

- In July of 2016, the United States Postal Inspection Service (USPIS) discovered a mail parcel at the Providence Processing and Distribution Center addressed to ESSER at Subject Premises #1. This mail parcel originated in Hong Kong. Based on the facts and circumstances of this discovery and probable cause developed by law enforcement, USPIS obtained a federal search warrant for this mail parcel in the District of Rhode Island. A search of the parcel revealed approximately one half of a kilogram of a white powder that tested positive for Testosterone Enanthate, a steroid. On August 2, 2016, USPIS attempted a

---

[10] The National Institutes of Health categorizes methandienone as an androgen and anabolic steroid.

controlled delivery of this mail parcel to Subject Premises #1. The undercover USPIS Inspector who attempted the delivery stated in his report that **ESSER** answered the door, looked at the mail parcel and refused to take custody of the parcel. No further investigative action was taken following this attempted controlled delivery.

25.      **ESSER** owns a business called Esser Properties, LLC, operated at Subject Premises #1 and in York, Pennsylvania. This limited liability company was registered in the State of Pennsylvania on August 17, 2017. Esser Properties, LLC lists an address of 17 East Market Street in York, PA. However, a review of the CLEAR database for this property shows no listing for David **ESSER**, no business phone number, e-mail or other signs indicating the business is located there. [11]  Furthermore, despite conducting numerous website searches, I was unable to locate a website for Esser Properties, LLC. According to bank records obtained from Bank of America (BoA), **ESSER** lists Subject Premises #1 as the business address for Esser Properties, LLC. However, labor records for the Commonwealths of Massachusetts and Pennsylvania do not show that **ESSER** has any quarterly earnings reported for Esser Properties, LLC or for any other business in either state.[12] This investigation has established that **ESSER**'s primary source of income is the large-scale distribution of steroids.

*Nieves*

26.      **NIEVES** also has several prior arrests and convictions.

---

[11] CLEAR is a web-based investigative platform that searches proprietary sources and public records to obtain information on individuals and businesses.

[12] These results are based on Department of Labor records for MA and Dun and Bradstreet records from PA.

| Date | Offense | Venue | Sentence |
|------|---------|-------|----------|
| 12/09/14 | Driving after Suspended License | RI - 61-2014-01186 | 60 Days to Serve, 10 M Suspended, 10 M Probation |
| 01/06/15 | Driving after Suspended License | RI - 61-2014-13619 | Suspended Sentence of 6 months |
| 03/26/15 | Possession of Controlled Substance (Felony) | RI - P2-2014-1769A | 18 M Suspended & 18 Months Probation |
| 06/24/15 | Man/Pos/Deliver Cocaine 1 oz-1kg (Felony) | RI - 32-2015-04667 | Information/Indictment Waived |
| 09/16/15 | Driving after Suspended License | RI - 61-2015-09621 | 1 Year Probation Suspended Sentence |
| 06/29/16 | Driving after Suspended License | RI - 41-2016-01266 | 90 D Home Confinement |
| 10/26/17 | Possession of Sch I-V Controlled Substance (Felony) | RI - P2-2017-3074A | 2 Years Probation Suspended Sentence |

27.     Based on this investigation, I believe that **NIEVES** works for **ESSER** distributing steroids. Based on surveillance conducted during this investigation, **NIEVES** regularly traveled from his home in Rhode Island to Subject Premises #2 (**ESSER**'s Stash House) where I believe he assisted **ESSER** in the packaging of steroids for domestic distribution to addresses throughout the United States. According to Officer Ryan Mooney from North Attleboro Police Department, **NIEVES**' vehicle was observed multiple times per week parked across from Target Premises #1 and #2 in September and early October of 2019.[13]  **NIEVES** bank records show that he began

---

[13] At some point in late 2019, **ESSER** and **NIEVES** appear to have had a dispute. On January 4, 2020, I was notified by Detective Lattanzio that **ESSER** had been involved in an altercation at Subject Premises #1 earlier that same morning.  I received a copy of the North Attleboro Police report documenting this incident.  According to the North Attleboro Police report, on January 4, 2020, officers responded to a reported stabbing at the Subject Premises #1 at approximately 2:25 AM.  Upon arrival at the Subject Premises, North Attleboro Police Officers discovered an open door at the rear of the residence.  Officers

receiving cash and electronic deposits from various sources and transferring the money

to Target Account #1 in February of 2019. I believe that **NEIVES** received these

payments for steroids on behalf of **ESSER** and then transferred the money to Target

Account #1 as a way of obscuring the source of the funds and thereby laundering the

money. **NIEVES'** bank records also show that **ESSER** began depositing funds into

**NIEVES'** bank account at about the same time and I believe that these payments were

for **NIEVES'** assistance in **ESSER**'s steroid distribution scheme.

*McLaughlin and Alison*

28.     Neither **MCLAUGHLIN** nor **ALISON** have any criminal convictions.

**MCLAUGHLIN** and **ALISON** both appear to work for **ESSER** mailing steroids from

post offices in Rhode Island and Massachusetts. **MCLAUGHLIN** and **ALISON** made

the deliveries using two motor vehicles registered to **ALISON** (a 2004 tan Toyota

Corolla and the 2016 black Nissan Rogue). Post office security videos captured both

**MCLAUGHLIN** and **ALISON** hauling large trash bags of packages believed to contain

steroids for shipment into USPS post offices. The postage was paid for on **ESSER**'s

---

observed what appeared to be unspent bullets on the ground by the rear entrance.  Upon entering the
rear door, officers observed **ESSER** standing just outside of the door for Apartment #3 covered in blood
on his head, neck and chest area.  Officers entered the apartment door, which was open at the time and
encountered Regiane Celi De Moraes Delesposti Vieira.  According to North Attleboro Police, **ESSER** was
initially uncooperative and refused any medical attention.  Furthermore, **ESSER** asked the police to leave
his apartment.  **ESSER** eventually informed the police that he was at a bar in Providence and was
attacked upon his return to his residence by a masked individual who struck **ESSER** in the head with a
firearm.  **ESSER** stated that he fought against the attacker who fled on foot.  **ESSER** stated that he
believed that the attacker was the brother of Mason **NIEVES**.  **ESSER** informed the police that he used to
"hang out" with **NIEVES** and that the two had a "falling out."  **ESSER** provided no further information
and did not report anything stolen from the Subject Premises #1.  Based on this report and the fact that
**NIEVES'** vehicle was not seen at the Subject Premises during this time frame, I believe that **NIEVES** may
have recently discontinued his work for **ESSER** following this dispute.

24

"Click-N-Ship" account billed to his credit card.[14] The mailings occurred on a weekly basis and **ESSER** made weekly deposits into **ALISON**'s bank account. I believe that the payments from **ESSER** represent remuneration for the services they provide to him in his steroid distribution business.

IV.     PROBABLE CAUSE

*The North Carolina Investigation*

29.     In April of 2018, HSI Special Agents assigned to the Winston-Salem, North Carolina office began an investigation of **ESSER**. On April 23, 2018, HSI Winston-Salem Special Agents and Task Force Officers (TFO), in coordination with the Alamance County Narcotics Enforcement Team (ANET), made a controlled delivery of a DHL mail package containing a controlled substance (that initially field-tested positive for fentanyl) to Joseph Alvin Patterson, 1079 Ivey Road, Apartment H, Graham, North Carolina 27253.[15] The positive fentanyl field test was a false positive. The full laboratory analysis determined that the substance was raw steroids.

30.     This controlled delivery led to the discovery of a steroid and pill manufacturing lab and the seizure of numerous different types of steroids and other

---

[14] Click-N-Ship is a service offered by the USPS that allows customers to create their own pre-paid Priority Mail shipping labels with the postage electronically billed back to the customer. Drug dealers use Priority Mail because of the predictability of delivery and the ability to track parcels.

[15] This mail parcel was one of four DHL parcels from Hong Kong addressed to Vickie Hollars, Anna Hollars and Tracey Rogers at the Wrap, Pack and Ship Store, a commercial packing and shipping company located at 1024 Mebane Oaks Road, Mebane, NC. A controlled delivery resulted in the apprehension of Anna Hollars Allen at the Wrap, Pack and Ship Store. Hollars Allen cooperated with law enforcement and assisted with the delivery to Patterson at 1079 Ivey Road.

controlled substances used in the production of counterfeit pharmaceuticals. Patterson was arrested and charged under North Carolina Law with multiple felony violations of the North Carolina Controlled Substance Act.[16]

31.     On June 7, 2018, HSI Winston-Salem Special Agents and TFOs interviewed Patterson in the presence of his attorneys. Patterson admitted to being the "middle man" between a steroid distributor based in Massachusetts and the testosterone producers and shippers based in Hong Kong. Patterson stated that he received orders via email from his "business partner" (whose full identity he did not know) in Massachusetts. Patterson stated that his business partner placed the orders directly with the company overseas and made the payments. Once the testosterone was ordered from Hong Kong, the product was shipped to various post office boxes Patterson maintained in North Carolina. Patterson "cooked" the testosterone to produce a liquid-based steroid that he then shipped to various post office boxes associated with his business partner in Rhode Island and Massachusetts.

32.     During the interview, Patterson admitted that he was still in contact with his business partner and that person was sending him 5 kilograms of raw testosterone to be converted into 1,800 vials of liquid steroids. Patterson agreed to assist HSI Winston-Salem with the receipt of the testosterone and an attempted controlled delivery in order to identify his business partner.

33.     On June 18, 2018, Patterson received a shipment of approximately 2.5

---

[16] On January 13, 2020, as a result of this controlled delivery, Patterson was convicted on state narcotics trafficking charges in North Carolina Superior Court (Case #18CRS052107).

kilograms of raw testosterone (enough to produce approximately 900 vials of liquid
steroid). The drugs were seized upon receipt. On June 20, 2018, Patterson also received
several packages containing materials needed to convert raw testosterone into liquid
steroid and $1000 to cover processing costs from his business partner. Patterson stated
that his business partner regularly sent him money to assist with the costs of producing
the liquid steroids and shipping them to MA and RI. Patterson stated that his business
partner did not receive shipments from Hong Kong himself and did not ship steroids to
Patterson. HSI Winston-Salem also seized these non-drug items of evidence.

34.     The invoice associated with the shipments revealed that the material was
shipped by David **ESSER**, 9 Fisher Street, Apt. 3, North Attleboro, Massachusetts 02760
(Subject Premises #1), Email: essertwo@yahoo.com, Telephone: (508) 838-7568.

35.     On June 21, 2018, Patterson communicated with **ESSER** under the
supervision of investigators and falsely informed him that the product (liquid steroid)
was finished and ready to be shipped. That evening, **ESSER** provided Patterson with
two shipping addresses. **ESSER** also informed Patterson that an additional 2.5
kilograms of testosterone would be arriving on or about June 26, 2018.

36.     On June 22, 2018, HSI Winston-Salem, in coordination with Postal
Inspectors in Greensboro, North Carolina, generated tracking numbers for the shipment
of two boxes containing approximately 900 vials of an inert liquid (450 per box), as well
as a small representative sample of steroids to be shipped to the addresses provided by
**ESSER**:

- 1800 Mineral Spring Avenue, #195, North Providence, Rhode Island; and

- 279 East Central Street, #255, Franklin, Massachusetts.[17]

37.     HSI Winston-Salem Special Agents contacted the HSI Providence Office to assist with the controlled delivery of the mail parcels in furtherance of the investigation.

38.     On Monday, June 25, 2018, HSI Providence Special Agents assisted an HSI Winston-Salem Special Agent, an HSI Houston Special Agent, TFOs and U.S. Postal Inspection Service (USPIS) Inspectors with a controlled delivery of one of the mail parcels containing anabolic steroids. The package was addressed to the P.O. Box located at 1800 Mineral Spring Avenue in North Providence, RI. **ESSER** attempted to receive the package and was taken into custody.

39.     **ESSER** consented to a search of his "business address."[18] His business address was then located at 130 N Washington Street, Apt 106, North Attleboro, Massachusetts. From apartment #106 at 130 N Washington Street, Agents seized over 30 kilograms of steroids (more than 78,000 units). The steroids were in the form of liquids and pills. Law enforcement also recovered 10.51g of amphetamine (Schedule II) in the form of 37 blue oval pills. Below are several photographs of the steroid processing operation **ESSER** conducted from this previous stash house location:

---

[17] The addresses are storefront commercial shipping companies where the public can rent mailboxes and access domestic and international shipping services. The storefront located at 1800 Mineral Spring Avenue, "Mail Boxes Plus North Providence," offers mail boxes, shipping services, copies, faxes and notary public services. The storefront located at 279 East Central Street, Franklin, MA, "postalcenter," offers mailboxes, shipping printing and other business services.

[18] Although **ESSER** referred to this location as a business address, it had little or nothing to do with Esser Properties, LLC. It was simply a drug stash house. Subject Premises #2, which is believed to be his new stash house, is located nearby. According to HSI Winston Salem TFO, **ESSER** consented to the search of his business address but did not want law enforcement to search his home address at the Subject Premises #1. **ESSER** stated that he did not want his neighbors to find out about police activity at his home.





40.     According to the HSI Special Agent and TFO involved in the interview of

**ESSER** at the time of this controlled delivery and consent search, **ESSER** admitted to

working with Patterson in North Carolina and offered to cooperate with law

enforcement against Patterson in an effort to reduce his criminal liability. **ESSER**

disclosed the P.O. boxes that he uses and discussed payments to Patterson for preparing

the vials of steroids. **ESSER** also provided law enforcement with the names of several

online steroid forums and websites where steroids are discussed and sold.

41.     HSI Winston-Salem retained the controlled substances as evidence for

potential prosecution of **ESSER** in the Middle District of North Carolina where the

investigation remained open. The United States Attorney's Office in that District has not

charged that crime and the investigation of **ESSER** has continued.

*The Mansfield Massachusetts Investigation*

42.     In the spring of 2019, the Mansfield Massachusetts Police Department

(MPD) received a tip that **ESSER** was in the business of selling drugs.  MPD Detectives

developed new information that **ESSER** was still engaged in the sale of illegal drugs

and the laundering of drug proceeds in Massachusetts, Rhode Island and beyond. MPD

sought assistance from federal law enforcement and joined in this investigation.

43.     As part of the preliminary MPD investigation, that law enforcement

agency determined that **ESSER** had opened P.O. Box 620 (Subject Premises #3) in the

Town of Mansfield on April 12, 2017 -- even before the North Carolina search and

seizures.  Based on the earlier North Carolina investigation, I know that while

identifying the P.O. Boxes used in this scheme (during his post-arrest interview with

HSI Winston-Salem/Houston Agents) that **ESSER** omitted any mention of that

particular P.O. Box. Moreover, postal records established that **ESSER** received and

continued to receive packages at that Mansfield Post Office after the steroid seizures

from his "business address" in June of 2018. Records indicate that in the past year alone,

from January 14, 2019 through January 11, 2020, **ESSER** received over 930 mail parcels

at P.O. Box 620 (Subject Premises #3). After being contacted by MPD, USPIS Boston and

HSI Boston renewed this investigation in March of 2019.

*Trash Pulls at the Subject Premises*

44.     An investigative technique used on several occasions in this investigation

is known as a "trash pull." In a trash pull, law enforcement officers (sometimes

disguised) collect rubbish in public after it has been discarded. I have worked with

MPD officers to sort through trash that they collected from both Subject Premises 1 and

2. The trash discarded by **ESSER** and his co-conspirators clearly indicated that both

locations are being used to store, process, package and mail large amounts of steroids

and to collect the proceeds from that drug trafficking activity.

*Trash Pulls at Subject Premises #1*

45.    On April 24, 2019, MPD Detective Tony Lattanzio removed several trash

bags that were discarded at Subject Premises #1. Detective Lattanzio opened the bags

and examined their contents at his department. Detective Lattanzio reported that he

had found several items of evidentiary value.

46.    On May 8, 2019, I too observed these items of evidence at the MPD. One

discarded USPS letter addressed to P.O. Box 620 in Mansfield, MA, listed **ESSER**'s

initials "D.E."[19] Another scrap of paper in particular appeared to be a ledger containing

names of steroid products with associated pricing. For example, the ledger listed "180

Primo E" with the price of $180.00 next to it. I am aware from viewing numerous online

body-building websites that Primo E is a reference to Metenolone Enanthate, an

anabolic steroid that was sold under the brand name of Primobolan.[20] This ledger also

---

[19] Inspector Hebert has observed numerous mail parcels delivered to P.O. Box 620 in Mansfield that he believed to contain cash. Inspector Hebert has told me that he believes this because they were small soft-sided parcels and when he picked them up, he could feel the contents which had the size and shape of bundles of currency.

[20] I am also aware that **ESSER** advertises several different types of "Primo" and "Tren-A" for sale online, discussed *infra*.

listed "200 Tren A" for $200. I am aware from viewing body building websites that Tren

A is a reference to Trenbolone Acetate, an anabolic steroid. Below is a photo of this

ledger found in **ESSER**'s discarded trash:



47.    On August 8, 2019, Detective Lattanzio and another Mansfield Detective

conducted another trash pull from the Subject Premises #1 and collected one white

trash bag discarded from **ESSER**'s residence.

48.    On August 15, 2019, I went to MPD to view the contents. In this trash pull,

I observed numerous items linking **ESSER** to Subject Premises #1. The contents of the

trash bag demonstrated that it was discarded from Subject Premises #1. A number of

documents were addressed to **ESSER** at Subject Premises #1. Numerous notes and

labels for various types of steroids demonstrated that **ESSER** packaged and distributed

these controlled substances from Subject Premises #1. The large number of steroid

labels, money order receipts, ledgers and packaging material recovered from just this

single trash bag suggested a large-scale distribution scheme directed by **ESSER** from

Subject Premises #1.



a.  Two bills were from the North Attleboro Electric Department for August of 2019.

One bill was addressed to **ESSER** for service at Subject Premises #1 further

establishing his connection with that location. The other was addressed to his

coconspirator, **MCLAUGHLIN**, for service at Subject Premises #2 (a stash

house). Found together, the bills suggest that both locations were maintained by

**ESSER** even though Subject Premises #2 (a stash house) is rented in

**MCLAUGHLIN's** name and that **MCLAUGHLIN** works for **ESSER** to facilitate

the drug conspiracy.



b.  One sheet depicted a printed steroid order and related prices from one of

    **ESSER**'s customers residing in Montague, MI. This one order listed seven

    different steroid products supplied by **ESSER** (e.g. "Winny," a nickname for the

    anabolic steroid, Winstrol and "Anadrol," another anabolic steroid). The price for

    this one order totaled $795. However, the order was annotated "$650.00 after

    discount." The order also reflected **ESSER**'s initials ("d.e.") and his address ("po

    box 620 mansfield, ma").



c. Another note listed the bulk raw steroid **ESSER** needed to order for his business, "raws needed." The note reflected the need for "Tren Ace – 1 Kilo" and "Tren Enth – 1 Kilo." I believe that the two products listed are Trenbolone Acetate and Trenbolone Enanthate, both illegal steroids. The fact that **ESSER** ordered kilograms of these controlled substances at a time is another indication of the magnitude of his drug operation.



d. I also found over one hundred printed labels bearing the names of two types of steroids -- Testosterone Cypionate and Anavar 50mg. These labels had adhesive

35

backing, allowing them to be affixed to packaging for individual orders.[21] I

noticed that each of these labels contained the words "Made in U.S.A." However,

I am aware from this investigation that **ESSER** imported the raw materials

needed to refine steroids from Hong Kong. I therefore believe that **ESSER** is

falsely labeling the steroids that he is selling to lead his customers to believe that

the drugs are produced in the United States as a false assurance of the quality of

the misbranded drug.



e.  I also discovered two clear plastic bags in **ESSER**'s trash with USPS Priority Mail

labels affixed. Each of these bags was labeled $10,000. As part of this

investigation, I have become aware that **ESSER** sometimes accepts cash in

payment for the sale of steroids. The discovery of these two bags confirmed that

**ESSER** collected and maintained large amounts of cash proceeds that he earns

---

[21] The labels for "Anavar 50mg" were the same labels that **ESSER** sent to me during an undercover purchase of Anavar from him in late June of 2019, as will be described in more detail further on in this affidavit.

from the sale of illegal drugs at Subject Premises #1.



49.     On January 10, 2020, detectives from MPD assisted by detectives from the

North Attleboro Police conducted another trash pull from the Subject Premises #1 and

collected several trash bags discarded from **ESSER**'s residence.

50.     On January 10, 2020, I went to MPD to view the contents. In this trash

pull, I observed numerous items linking **ESSER** to Subject Premises #1 and the Subject

Premises #3. The contents of the trash bag demonstrated that it was discarded from

Subject Premises #1. A number of documents were addressed to **ESSER** at Subject

Premises #1. I discovered multiple USPS mail parcels and envelopes addressed to

**ESSER**'s initials "D.E." at P.O. Box 620 Mansfield, MA (Subject Premises #3). I also

noted that several of the individuals listed as the senders of the envelopes and boxes

also received mail parcels from **ESSER**, according to his Click-N-Ship account records.

One of the mail envelopes addressed to **ESSER** was from an individual named "Mike

Kalustian" of Destin, Florida. I also discovered a corresponding letter-sized opaque

envelope in **ESSER**'s trash bearing the name Kalustian. I then conducted a search of the

social media platform, Facebook for the name Mike Kalustian and discovered that there

is an individual by this name in Destin, Florida who lists his profession as a

Chiropractor and posts several photos of himself competing in body building

competitions. I know that some body builders use steroids to enhance their competition

performance. I also know from working this investigation that some of **ESSER**'s steroid

customers pay cash for steroids. Based on these findings, I believe that the envelope

from Kalustian and the others addressed to **ESSER** were likely cash payments sent to

**ESSER** for steroids. The large number of envelopes addressed to **ESSER** at the Subject

Premises #3 recovered from his trash at the Subject Premises #1, suggests that **ESSER**

uses Subject Premises #3 to receive proceeds that he then transports to and likely stores

at Subject Premises #1 in furtherance of his distribution scheme.

*Trash Pulls at Subject Premises #2*

51.     **ESSER** also uses an apartment located at 145 N. Washington Street,

Apartment #7, North Attleboro, MA (Subject Premises #2) to store and process steroids

and other drugs. Such locations are called "stash houses" in the drug trafficking

business. Experienced drug dealers use stash houses that are physically separate from

their homes, sometimes owned or rented in the names of other people or provide

utilities in the names of other people to distance themselves and their primary

residences from where they store larger quantities of controlled substances over time.

This stash house (Subject Premises #2) is rented in coconspirator **MCLAUGHLIN**'s

name.[22] Drug traffickers use stash houses in this manner to try to defeat law enforcement investigations. I believe that after the drug seizures at 130 Washington Street by HSI Providence and HSI North Carolina personnel in 2018, **ESSER** simply moved that operation to nearby 145 N. Washington Street.

52.      In my investigation, I associated **ESSER** with this apartment in many ways and I believe that it is used as a stash house. For example, in addition to the evidence recovered in trash pulls, I watched **ESSER** and his coconspirator **NIEVES** enter this apartment building on May 15, 2019. **NIEVES** carried a large box into the building. **NIEVES'** motor vehicle was observed regularly parked in front of the entrance to this building as recently as October of 2019. On October 18, 2019, I observed **ESSER** exit the front door of his residence (Subject Premises #1) and walk to the entrance of 145 N Washington Street (Subject Premises #2). On February 4, 2020, I observed **ESSER** depart this address and enter his Toyota Camry parked in front of the building on N Washington Street. The apartment is rented and the utilities are paid in **MCLAUGHLIN**'s name. Although the electric bill is issued in **MCLAUGHLIN**'s name, **ESSER** is paying the bill because it was found it at Subject Premises #1 as further confirmed by the payment records of the North Attleboro Electric Company. I also know that **MCLAUGHLIN** resides at 41 Eddy Street in North Attleboro and that

---

[22] According to North Attleboro Electric Department, **MCLAUGHLIN** filed an application for service at 145 N Washington Street, #7 in February of 2019. However, North Attleboro Electric Department records reveal that payments for service at 145 N Washington Street, #7 are made electronically by David M **ESSER** of 9 Fisher Street, #3. This information is current as of January 14, 2020. **ESSER**'s payments for utilities at the Subject Premises #2 further confirms that he is using this address in furtherance of his drug trafficking scheme while attempting to conceal this fact by having **MCLAUGHLIN's** name on the utilities.

**NIEVES** resides at 164 Parade Street, Apt 1, Providence, RI. I know this because, among other things, surveillance has observed **MCLAUGHLIN**'s vehicle and **NIEVES**' vehicle (a 2013 black Cadillac) parked in the driveways of their respective residences at 41 Eddy Street in North Attleboro, MA and 164 Parade Street in Providence on several occasions during this investigation.

53.      On August 5, 2019, while conducting surveillance in the vicinity of 145 N. Washington Street in North Attleboro, I watched USPIS Inspector Brian Bukuras enter the public/common area of the apartment building that houses Subject Premises #2. He entered at the rear entrance on Fisher Street, which was determined to be directly adjacent to Subject Premises #1. As he left the building, Inspector Bukuras observed a dumpster next to the stairwell. Inspector Bukuras looked into the dumpster and observed a large opened cardboard box. Inspector Bukuras retrieved this box from the trash dumpster and placed it in his vehicle.

54.      I then met with Inspector Bukuras in a nearby parking lot and examined the contents of this box. The exterior box was large with no markings. However, inside of the large box was a smaller opened USPS shipping box. In addition to the USPS shipping box, I saw a number of plastic vacuum-sealed bags that had been cut open as well as packing paper.

55.      The smaller USPS box bore a mailing label:

> Shipper:
> Cross-World Enterprises Inc.
> CWE
> 4161 BOWNE ST FL 1ST
> FLUSHING NY 11355-2642

Recipient:
D e
PO Box 620
Mansfield, MA 02048

56.     The recipient, listed only as "D e," represents **ESSER**'s initials. However,

the use of initials appeared to me to be an effort to disguise his identity. Although I

could still read the recipient listed on the box, I noticed that someone further attempted

to obscure the recipient's information using a black colored marker. I know from this

investigation that P.O. Box 620 in Mansfield, MA is used by **ESSER**.[23] I ran the USPS

tracking number affixed to this mail parcel through a web-based online mail tracking

site and discovered that this parcel was delivered to Mansfield on May 13, 2019. I also

observed that this USPS mail parcel had the three letters HCG written in large black

marker across the box. I know from working this investigation that HCG is likely an

acronym for Human Chorionic Gonadotropin, which is sometimes taken by anabolic

steroid users to reverse some of the side effects of steroid use such as infertility. Based

on these findings, I believe that this USPS mail parcel was discarded by **ESSER** or one

of his co-conspirators from Subject Premises #2 and is evidence of drug trafficking

occurring at that location.

57.     On August 8, 2019, the same day that MPD conducted a trash pull from

---

[23] I am aware from talking with Inspector Hebert that on May 10, 2019, **ESSER** received a mail parcel at PO Box 620 in Mansfield addressed to him as "D.E." from "Luis Lopez of PO Box 2353, Secaucus, NJ 07094. Inspector Hebert has informed me that this USPS mail parcel felt like it contained vials. I know from this investigation, that **ESSER** ordered vials of steroids delivered to his previous PO Box in North Providence, RI in June of 2018. I am also aware from reviewing DHS customs records that this return address in Secaucus, NJ receives frequent shipments from Hong Kong, a known source of steroids.

the Subject Premises #1, they also conducted a trash pull from Subject Premises #2.

Mansfield Detectives pulled several black trash bags that were discarded in the same

dumpster, located next to the building's entrance nearest Premises #2, where Inspector

Bukuras had collected trash on August 5, 2019.

58.     I examined the contents at the MPD on August 15, 2019. I observed more

evidence indicative of the packaging and distribution of steroids at Subject Premises #2.

I also found several boxes from industrial packaging supply companies "Uline" and

"Clearbags" addressed to **ESSER** at the Subject Premises #1, again linking him and his

drug operation to both Subject Premises #1 and #2.

59.     I observed hundreds of steroid labels printed on adhesive paper. These

labels were nearly identical to the ones found in the trash from the Subject Premises #1.

These labels also contained the words "Made in U.S.A." There were several types of

steroids printed on these labels, including Winstrol 50mg.[24]



60.     I observed that the trash from the Subject Premises 2 contained bags and

---

[24] I noticed that the white labels with pink and black lettering for Winstrol 50mg, were the same type of labels **ESSER** used to mail me Winstrol during an undercover purchase later detailed in this affidavit.

packaging material commonly used to transport and store bulk controlled substances.
In fact, several bags, were labeled "Winny 50mg" and "Var 50mg," which are slang
terms for the steroids Winstrol and Anavar/Oxandrolone. These bags appeared to
contain powdery residue. Based on the labeling and what I have learned during the
course of this investigation, I believe that these larger bags and others found in the trash
for Subject Premises #2 contained bulk steroid powder that **ESSER** imported into the
United States. I believe that these bulk amounts were converted into pills and liquids
and packaged at Subject Premises #2; then labeled and mailed to steroid customers
located throughout the United States.



61.     I also found a motor vehicle insurance policy receipt addressed to
**ALISON** R. Esser at 4 Towne St., North Attleboro, MA. This policy covered two
vehicles - a Toyota Corolla and a Nissan Rogue. Surveillance officers have seen the
Corolla driven by **MCLAUGHLIN** and used to deliver parcels containing steroids to

post offices. Surveillance officers once saw **MCLAUGHLIN** removing parcels believed to contain steroids from Nissan Rogue prior to delivering them to the post office. Furthermore, I have seen **ALISON** driving the Nissan Rogue to Subject Premises #1 on October 18, 2019 and have seen this vehicle parked at Subject Premises #1 on numerous occasions during this investigation. The discovery of the insurance documents for these two vehicles at Subject Premises #2 further suggested to me that **ALISON** works for **ESSER** and that the motor vehicles are used in this scheme to traffic steroids.



62.     On January 10, 2020, the same day that MPD and North Attleboro Police conducted a trash pull from Subject Premises #1, they also conducted a trash pull from Subject Premises #2. Mansfield Detectives pulled several black trash bags that were discarded in the same dumpster, located next to the entrance accessible from the Fisher

44

Street side of the building.

63.     I examined the contents at the MPD on January 10, 2020. I observed more evidence indicative of the packaging and distribution of steroids at Subject Premises #2. Again, I discovered industrial packaging supply items and a receipt from the supply company called "Clearbags" addressed to **ESSER** at the Subject Premises #1, linking him and his drug operation to both Subject Premises #1 and #2. In addition, I also found several large empty boxes with labels from the company Duran, Wheaton and Kimble, a laboratory supply company. The labels affixed to these boxes indicate that the boxes each contained 100 vials. The labels contained the part number "W225282". I conducted a web search of this part number and discovered that these are 10ml clear vials sold by Duran, Wheaton and Kimble. I am aware from working this investigation that **ESSER** and others engaged in the sale of steroids, often sell 10ml liquid doses of these controlled substances to their customers. I also discovered over 20 sheets of used labels, much like the ones I discovered during the previous trash pull at Subject Premises #2. The label sheets discovered in the trash of Subject Premises #2 were all empty, indicating that the sticker labels had been used. Each label sheet originally contained 30 individual labels. Therefore, based on these findings, I believe that **ESSER,** or one of his co-conspirators, affixed over 700 individual steroid labels to steroid packaging in just this one week's worth of trash from Subject Premises #2. In addition to the used label sheets, I also discovered several large Ziplock bags, each containing a hand-written description of the contents. Among the hand-written labels on these bags were "Proviron 50mg", "Dbol 50mg", and "Var 50mg". These are brand named or

45

abbreviated brand names for three types of steroids, Mesterolone, Metandienone, and Oxandrolone, which are all controlled substances. Several of these plastic bags clearly contained powdery residue and were seized and stored into evidence. Lastly, I also discovered a large empty box addressed to an unknown individual in Pawtucket, RI. According to the UPS label, this box weighed 33 pounds and was shipped by an individual named "CHRIS DECAMILLO". The return address appeared to be a PO Box at a UPS store in York, PA. A search of the CLEAR database reveals that there is only one individual named Chris Decamillo residing in York, PA. Decamillo's address is listed as 460 S Pershing Ave., York, PA. As described in more detail later in this affidavit, this address is owned by **ESSER** and was purchased using proceeds from the illegal sale of controlled substances. I am aware from this investigation that, in an effort to disguise his trafficking activities, **ESSER** uses other individuals and P.O. boxes to ship and receive bulk steroids prior to the processing and distribution phase.

*Subpoena of United Parcel Service Records*

64.     As part of this investigation, I requested records from the United Parcel Service (UPS) pertaining to **ESSER**'s business activity with that company. This information revealed that from January of 2017 through May 2019, **ESSER** received over 300 shipments at his home address (*Subject Premises #1*). Numerous labeled shipments suggested that **ESSER** was receiving items used in the processing, packaging and distribution of steroids. For example, **ESSER** received 45 shipments from a company called "Clearbags.com." The company's website advertised that they sell wholesale bags, boxes and other packaging material for commercial shipping purposes.

46

The packages received from Clearbags.com ranged from 7-15 pounds each, according to UPS records. Moreover, evidence of the Clearbags.com shipments delivered to Subject Premises #1 was discovered in the trash at Subject Premises #2 intermingled with other drug evidence. A review of **ESSER**'s Target Account #1 reveal regular payments to Clearbags made from a debit card associated with **ESSER**'s Target Account #1.

65.     **ESSER** also received at least 12 shipments of labels. The only labels I observed in the trash from either Subject Premises #1 or #2 were imprinted with the names of steroids.

66.     **ESSER** received 24 total UPS shipments from a company called Uline, based in Allentown, PA. Uline's website advertises that it is an industrial packaging and shipping supply company catering to businesses throughout North America. Evidence of these Uline shipments were also discovered in the trash at Subject Premises #2 intermingled with other drug evidence. Moreover, evidence of the Uline shipments delivered to Subject Premises #1 was discovered in the trash at Subject Premises #2 intermingled with other drug evidence. A review of **ESSER**'s Target Account #1 reveal regular payments to Uline made from a debit card associated with **ESSER**'s Target Account #1.

67.     Other shipments of interest included three shipments from a company called Research Laboratory Supply, Inc. The company's website advertised that they specialized in the sale of medical and lab supplies. Their website's home page contains three main links for "Chemicals & Solvents," "Syringes and Needles," and "Glass Vials." There were four other shipments from a similar medical supply company based

47

in Florida called GPZ Services. That company likewise touted that it specialized in vials,

syringes and other lab and medical supplies. I know that **ESSER** used his debit card

associated with Target Account #1 to make at least one payment to GPZ Services. I

know from working this investigation and others that these items are commonly used

in the use, processing, storing and distribution of steroids.

68.     Although the contents of many of these shipments were not labeled and

are therefore unknown, because **ESSER**'s primary occupation appears to be steroid

trafficking it is reasonable to assume that all or most of the 300 UPS deliveries were

associated with large scale drug trafficking.

69.     Furthermore, on May 1, 2019, while conducting surveillance of Subject

Premises #1, I observed **ESSER** receive a large shipment of packaging material

delivered by USPS rather that UPS. On that date, the USPS delivered over 500

cardboard mailing boxes to **ESSER**. The volume of these USPS shipping boxes was so

large that the USPS delivery person was required to make several trips from his truck to

the door of Subject Premises #1 to make the entire delivery. I know from reviewing

photos taken during the consent search of **ESSER**'s previous stash house located at 145

N Washington Street, Apt 106, in North Attleboro, MA, that **ESSER** maintained a large

stash of similar USPS boxes in that location for the purpose of mailing steroid orders to

his customers.

70.     These shipments to **ESSER** of large amounts of packaging, processing and

labeling supplies are consistent with what I have learned during the course of this

investigation; namely, that **ESSER** distributes large amounts of steroids through the

mail to customers located throughout the United States.

*Mailings*

71.    During the course of this investigation, I observed that **ESSER** uses

**ALISON** and **MCLAUGHLIN** to mail large numbers of parcels believed to contain

steroids through the U.S. mail on a weekly basis. These mailings occurred both in

Rhode Island and Massachusetts. U.S. Postal Inspector Elijah Hebert reported that mail

parcels associated with **ESSER**'s Click-N-Ship account (Account # 113976867) were

regularly mailed from the Main Post Office located at 55 Corliss Street in Providence,

RI.

72.    Inspector Hebert went to the Main Post Office in Providence and

reviewed video surveillance of that post office lobby where customers enter to drop off

mail. Inspector Hebert found video footage from the early morning hours of May 7th

and May 15th that captured a heavy-set white male (later identified as

**MCGLAUGHLIN**) depositing numerous packages associated with **ESSER**'s Click-N-

Ship account into the lobby mail receptacle. As a result of this discovery, surveillance

was established at this post office on several occasions to observe **MCGLAUGHLIN**

conduct these transactions.

73.    On May 22, 2019, one week after the video capture, Inspector Hebert and

Mansfield Detective Lattanzio conducted surveillance at the Providence Main Post

Office. Detective Lattanzio staged in the room where packages are deposited in the

lobby while Inspector Hebert was staged outside the lobby of the post office. At

approximately 5:52 A.M., Inspector Hebert observed the same heavy-set white male,

wearing tan pants and a fluorescent yellow shirt with the word "GARAGE" visibly printed on the back, carrying a white bag containing packages. The man walked into the lobby of the post office and dumped the packages from the white plastic bag into the lobby mail receptacle. In sum, 16 packages billed to **ESSER**'s Click-N-Ship account were deposited into the receptacle while Detective Lattanzio watched. The man then threw out the empty white plastic bag in the lobby garbage can.

74.    All 16 packages had a return address that I also know to have been associated with **ESSER**'s Click-N-Ship account at that time:

KATHY'S KREATIONS
715 ARMISTICE BLVD
PAWTUCKET RI 02861-2746

75.    That address in Pawtucket is a residential address and not known to be associated with anyone identified in this investigation. Furthermore, the Rhode Island Secretary of State database, the law enforcement CLEAR database, and a similar Google search for the business *Kathy's Kreations* disclosed no match for an existing business at that address or anywhere in Rhode Island. **ESSER** and other experienced drug dealers use return addresses that are not associated with them when sending drugs through the mail. I know from past investigation that **ESSER** follows this practice and I believe that **ESSER** does so intentionally to avoid detection from law enforcement.

76.    At approximately 5:54 A.M., on May 22nd, Inspector Hebert followed the heavy-set male to the post office parking lot in order to positively identify him as **MCLAUGHLIN**. The individual entered an unoccupied tan-colored Toyota Corolla

bearing Massachusetts registration 6FT483 and left. A motor vehicle database search revealed that Massachusetts license plate 6FT483 is registered to **ALISON** Esser of 4 Towne Street, North Attleboro, MA. It is one of the two motor vehicles identified in the insurance documents addressed to **ALISON** that I saw in the trash collected at Subject Premises#2.

77.     Inspector Hebert next conducted a social media query on Facebook for **ALISON** and discovered a Facebook profile for **ALISON** Esser of North Attleboro, MA. The profile picture on this account shows **ALISON** with the same male who was observed mailing the packages earlier in the day. **MCLAUGHLIN** has his own Facebook profile which also showed photographs of him with **ALISON**. **MCLAUGHLIN** was the male making package deliveries on **ESSER**'s Click-N-Ship account and he used a motor vehicle registered to **ALISON** to deliver the packages believed to contain steroids.

78.     Inspector Hebert also performed several online queries of James **MCLAUGHLIN** using investigative databases. These queries provided a RI driver's license number 2514670 for James **MCLAUGHLIN**. The driver's license photograph also appeared to be the same heavyset man observed mailing the packages earlier in the day. These database checks of **MCLAUGHLIN** revealed that his last known address was 41 Eddy Street, North Attleboro, MA (**MCLAUGHLIN**'s residence).

79.     On May 29, 2019, at approximately 4:45 A.M., Inspector Hebert and I initiated surveillance of both Subject Premises #1 and **MCLAUGHLIN**'s residence. Inspector Hebert observed the same tan Toyota Corolla, that **MCLAUGHLIN** was seen

driving on May 22nd and which is registered to **ALISON,** parked in the driveway.[25]

80.     At approximately 5:49 A.M., Inspector Hebert observed **MCLAUGHLIN,** wearing tan pants and a fluorescent yellow shirt leave his residence and walk to the tan Toyota Corolla. At the same time, the rear lift gate of a black Nissan Rogue bearing Massachusetts registration 47A170, parked directly in front of the Corolla, opened. The black Nissan Rogue is also registered to **ALISON** R. Esser of 4 Towne St., North Attleboro, MA. It is the other of the two motor vehicles identified in the insurance documents addressed to **ALISON** that I saw in the trash collected at Subject Premises #2.

81.     According to Inspector Hebert, **MCLAUGHLIN** removed a white-colored plastic garbage bag from the interior of the tan Toyota Corolla and walked to the back of the Nissan Rogue. **MCLAUGHLIN** rummaged through the back of the black Nissan Rogue and placed multiple items into the white bag. Inspector Hebert was able to see that one of the items was a small white box consistent with the size and appearance of the packages that **MCLAUGHLIN** previously mailed. **MCLAUGHLIN** placed the bag into the tan Toyota Corolla and left the residence.

82.     Inspector Hebert and I loosely followed **MCLAUGHLIN** as he traveled south towards Route I-95. Although we were not able to maintain visual surveillance of **MCLAUGHLIN**'s vehicle the entire trip, we anticipated that he would travel to the

---

[25] According to North Attleboro Electric Department, **ALISON** filed an application for service at 41 Eddy Street, 2nd Floor in February of 2018. At this time, **ALISON** listed a joint customer of James **MCLAUGHLIN** at this same residence. The utility bills for this residence are being paid to North Attleboro Electric Department by a Visa debit card in **ALISON**'s name.

Providence Main Post Office again to mail the packages as he had in the past.

83.     At approximately 6:08 A.M., I observed **MCLAUGHLIN**'s vehicle arrive

and enter the main parking lot for the post office. Both Inspector Hebert and I observed

**MCLAUGHLIN** sitting in his car, which was still running and stopped in the exit lane

of the post office parking lot. **MCLAUGHLIN** appeared to be talking on the phone.

Then he left without entering the post office or depositing the packages that he had

placed in the car he was driving.

84.     However, Inspector Hebert determined through USPS records, that

numerous mail parcels associated with **ESSER**'s Click-N-Ship account were mailed

later that day at various U.S. post offices located in Providence, RI and Wrentham, MA.

Based on our observations and findings, I believe that **MCLAUGHLIN** initially

retrieved the mail parcels from **ALISON**'s black Nissan Rogue, parked in the driveway

of his residence at 41 Eddy Street and transferred the parcels to her tan Toyota Corolla

intending to mail them at the main post office in Providence. I also believe that at some

point during the course of the surveillance that morning, **MCLAUGHLIN** was called

away or may have become aware of law enforcement vehicles conducting surveillance. I

believe that **MCLAUGHLIN** drove to the Main Post Office with the intent to mail the

parcels believed to contain steroids as he had the past three weeks. Instead, he waited

until later in the day to mail the parcels from other post offices in RI and MA for the

purpose of evading law enforcement surveillance.

85.     Despite **MCLAUGHLIN**'s apparent wariness of surveillance, he has

continued to ship large quantities of mail parcels on behalf of **ESSER**. Most recently, on

September 7, 2019, video camera footage captured **MCLAUGHLIN** drop a large trash

bag full of mail parcels linked to **ESSER**'s Click-N-Ship account at the Attleboro Post

Office.

86.     On August 29, 2019, the USPIS installed a camera at the post office located

at 775 Newport Avenue, Attleboro, MA. On August 30, 2019, video surveillance

captured **ALISON** dropping off a large trash bag full of mail parcels sent via **ESSER**'s

Click-N-Ship account. These mail parcels all contained a return address of 920 Smith

Street, Providence, RI. Similarly, on September 3, 2019, she was again captured on video

depositing 12 parcels contained in large white plastic trash bag. As stated above, on

September 7, 2019, this video camera also captured **MCLAUGHLIN** dropping off a

black plastic bag containing mail parcels linked to **ESSER**'s Click-N-Ship account. These

three photos appear below.







87.     According to Inspector Hebert, on October 18, 2019, at approximately

12:07 PM, **ALISON** arrived at the post office located at 775 Newport Avenue, Attleboro,

MA with 13 mail parcels. Inspector Hebert requested photographs of these mail parcels

from the post office staff. These thirteen mail parcels were all associated with **ESSER**'s

Click-N-Ship account and all had a return address of:

55

THEREASA GOMES
920 SMITH ST
PROVIDENCE, RI 02908-2716

These mail parcels were destined for individuals in ten different states around the country (TX, NY, IN AL, AZ, CA, OH, LA, WA, and NJ). On this same date, prior to her dropping these mail parcels at the post office, I was conducting surveillance of Target Premises #1 and observed **ALISON** driving the 2016 Nissan Rogue towards Target Premises #1. I then circled the block and drove past Target Premises #1 and observed **ALISON**'s vehicle parked behind the residence. I also observed that **ALISON** circled the block one time prior to parking at Target Premises #1. I believe that **ALISON** may have conducted this circuitous route to the Target Premises #1 to avoid surveillance detection by law enforcement. During this same time frame, I observed **ESSER** depart Target Premises #1 and walk towards the entrance of Target Premises #2. Based on these findings, I believe that **ALISON** retrieved the 13 mail parcels containing steroids from either Target Premises #1 or #2 and dropped them off at the South Attleboro Post Office for distribution to **ESSER**'s customers in ten different states.

88.     On October 28, 2019, Inspector Hebert contacted me and informed me that **ALISON** mailed 15 mail parcels associated with **ESSER**'s Click-N-Ship account from the South Attleboro Post Office. According to Inspector Hebert, he spoke with an employee at that post office on this same date who informed him that **ALISON** was driving the Nissan Rogue bearing MA registration 47A170 when she made this trip to the post office. According to Inspector Hebert, he was contacted again on October 29, 2019, by an employee at this same post office who informed him that on this date,

56

**MCLAUGHLIN** dropped off 15 mail parcels linked to **ESSER**'s Click-N-Ship account.

89.     According to Inspector Hebert, he was notified by the post office in Attleboro again on November 19, 2019, regarding another 13 mail parcels being shipped out under **ESSER**'s Click-N-Ship account. Inspector Hebert requested photographs of these mail parcels from the post office staff. Inspector Hebert and Inspector Brian Bukuras confirmed that these 13 mail parcels were all sent using **ESSER**'s Click-N-Ship account and contained return addresses of:

CAROL HANAGAN
197 SLATER AVE
PROVIDENCE, RI 02906-5811

These mail parcels were also destined for individuals in ten different states around the country (TX, NY, IL, AZ, OK, KY, LA, WA, IA, and TN).

90.     On January 13, 2020, USPIS Inspector Bukuras was notified that a female came to the South Attleboro Post Office and dropped sixteen mail parcels associated with **ESSER**'s Click-N-Ship account and destined for addresses throughout the U.S.  A review of the surveillance photos for this post office, which were provided to me by Inspectors Hebert and Bukuras, revealed that **ALISON** dropped off these mail parcels and departed the parking lot in the white Toyota Camry registered to **ESSER** as seen below:



91.    I believe that **ALISON** maintains vehicles in her own name that are used

in furtherance of this drug trafficking operation and that she mails shipments of

steroids on behalf of **ESSER** on a weekly basis. More specifically, I am aware that

**ALISON's** primary vehicle is her 2016 Nissan Rogue purchased on February 4, 2019,

from CarMax located in North Attleboro, MA for $23,003 according to Massachusetts

DOT records. I am also aware that **ALISON** initially put down $10,000 for this vehicle

and financed the remainder of the purchase through Ally Financial. I also know from

reviewing **ESSER's** Target Account #1 that on February 4, 2019, he wrote a check to Car

Max in the amount of $7,000. On July 9, 2019, Inspector Hebert photographed a mail

envelope addressed to **ESSER** at Subject Premises #1 from Ally Financial. A request for

records from Ally Financial revealed that **ALISON** financed $14,569 for this vehicle. At

the time of the purchase of this vehicle, **ALISON** stated that she was the "GM" at a Five

Guys (fast food chain restaurant) and reported a monthly income of $5,333. As of

58

October 28, 2019, Ally listed an outstanding balance on this vehicle of $10,333.13.

92.     **ESSER** has a weekly scheduled transfer of small amount of money from Target Account #1 to **ALISON**'s BoA account. I believe that these payments as well as the $7,000 payment towards **ALISON**'s Nissan Rogue are compensation for her role in **ESSER**'s drug trafficking.

*Postal Click-N-Ship Records*

93.     Postal records show that **ESSER**'s Click-N-Ship customer account number xxxxx6867 created 8,974 individual tracking numbers between March 21, 2017, when the account was initiated, through October 10, 2019. These nearly 9,000 individual tracking numbers represent mailings associated with this account that were delivered to addresses in all 50 states and the District of Colombia. **ESSER** used numerous different names and return addresses for these mailings, including his own name and **ESSER** Properties at the Subject Premises #1. More than 2,400 of these packages bore Rhode Island return addresses including:

- ANDREA WALSH, 49 SHERIDAN ST, CENTRAL FALLS, RI 02863-2375

- KATHY'S KREATIONS, 715 ARMISTICE BLVD, PAWTUCKET RI 02861-2746

- MICHELLE SANTAPEDRO , 31 HURLEY AVE, PAWTUCKET, RI 02860-3520

- REBECCA EDGE, 183 LESTER ST, PROVIDENCE, RI 02907-2467

- THEREASA GOMES, 920 SMITH ST, PROVIDENCE, RI 02908-2716

- WESTSIDE SERVICES INC. 31 HURLEY AVE, PAWTUCKET RI 02860-3520

- CAROL HANAGAN, 197 SLATER AVE, PROVIDENCE, RI 02906-5811

A review of these names and addresses through numerous online and law enforcement databases revealed that these individuals and businesses have no known association with the locations listed in the return addresses. Again, I believe that **ESSER** uses fictitious names and addresses for the purpose of avoiding detection by law enforcement while distributing steroids.

*Undercover Purchase of Steroids from Esser*

94.     When the MPD first received a tip concerning **ESSER**'s drug trafficking in March of 2019, the tipster provided the steroid forum called Brotherhood of Pain (BOP), *http://brotherhoodofpain.com*[26] (**BOP** Forum) as a site on which **ESSER** marketed steroids. The tipster also specified that the e-mail used by **ESSER** to take orders on the website was *thegoldline@protonmail.com*.[27] (**ESSER's** GoldLine e-mail.)

95.     In April of 2019, I reviewed the web site *http://brotherhoodofpain.com* and determined that it was, among other things, a steroid and body building web forum. This web forum listed multiple links allowing users to post comments or read forums covering a broad range of topics. Most related to bodybuilding and the use of steroids. On the home page of web forum, I saw a picture of a shirtless male torso with an exaggerated muscular build posing next to the caption "BrotherhoodofPain.com" and

---

[26] In September of 2019, Brotherhoodofpain.com appears to have redirected the majority of the content of their website to the domain Brotherhood.is.

[27] Proton Mail is an end-to-end encrypted e-mail service based in Switzerland. The encryption of this foreign-based e-mail service affords users a certain deal of anonymity not available to more widely used U.S.-based e-mail services such as those offered by Google and Yahoo.

the phrase "DON'T FUCK WITH THE BROTHERHOOD."[28]



96.    On the home page of the **BOP** Forum I observed tabs allowing users to click on a variety of links for information, including one tabbed "Steroid Sponsors." I also observed numerous advertisements for steroids posted on the **BOP** Forum.

97.    The home page of the **BOP** Forum stated:

We are the largest growing bodybuilding and steroid forum in the world. You can register for free to see our full list of advertisers as well as advertiser ratings and steroid reviews. We have over 40+ advertisers with everything from Steroids, HGH, and Post Cycle Therapy products for sale. Register now to see the reviews and decide who you wish to use. No reviews are ever edited or deleted so you can make an informed decision on who to use. Don't ever be scammed again and register now while it's still free to join our family! If this is your first visit, be sure to check out the

---

[28] On June 3, 2019, I conducted a search on "whois.icann.org." That search engine is a widely used internet resource that helps identify domain names and IP addresses. I conducted a search of the domain name BrotherhoodOfPain.com. The website was created on October 29, 2009 and appeared to be hosted outside of the United States. However, Verisign registers the domain name, "BrotherhoodOfPain.com." Verisign is a U.S. based domain registry.

FAQ by clicking the link above. You may have to register before you can post: click the register link above to proceed. To start viewing messages, select the forum that you want to visit from the selection below.

98.     Among other things, the **BOP** Forum stated, "We have over 40+ advertisers with everything from Steroids, HGH, and Post Cycle Therapy products for sale. Register now to see the reviews and decide who you wish to use."[29]

99.     In May of 2019, using a fictitious name, I registered on the **BOP** Forum by providing a user name, password and e-mail address on a registration page. Several days after registering, I received an email (to a non-governmental e-mail account) stating that I had been accepted for membership.

100.    On June 3, 2019, I used my user name and password to sign into the **BOP** Forum. While conducting my initial review of the **BOP** Forum, I observed links to "advertisers." I noticed that one of the advertisers was *TheGoldLine*. The phrase "Gold Line" was provided by the tipster and I identified it as **ESSER**'s online steroid trafficking business.

---

[29] I know that "HGH" is a reference to human growth hormone and "Post Cycle Therapy" is a reference to the process undergone once an individual completes a cycle of steroids. Post Cycle Therapy is used to restore and regulate a steroid user's hormones and testosterone.



101.    TheGoldLine was mentioned in over 1,000 posts, including several posts

made on that day (June 3, 2019). All of the posts that I read discussed the sale and use of

steroids. "TheGoldLine List" published **ESSER's** GoldLine e-mail that had been

provided by the tipster, namely *thegoldline@protonmail.com*. When I clicked on the

account associated with TheGoldLine, some background information on this particular

provider informed me that the user (**ESSER**) has been a member since September of

2018.

102.    TheGoldLine user (**ESSER**) required a $200 minimum purchase and

offered customers a 20% discount for using the cryptocurrency bitcoin. At the top the

TheGoldLine List was the following information:

OILS (10ml)

$200.00 min order

20% OFF IF USING BITCOIN

103.    "TheGoldLine List" contained dozens of products with names such as

"Metribolone (Methyltrienolone AKA MTREN) 2mg/10ml inj vial $50.00" and "DBOL

50 mg 50 tabs $ 55.00." These products are androgenic and anabolic steroids, which are

controlled substances. In addition to numerous other types of steroids, **ESSER** also advertised the sale of the erectile dysfunction drugs of Cialis and Viagra as well as a number of non-controlled supplements commonly used by bodybuilders and other athletes.[30] TheGoldLine List that appeared on the **BOP** Forum that I viewed on June 3rd was last edited on May 30, 2019 suggesting to me that it was an active site. I also saw numerous posts made by other website users complementing the TheGoldLine.

104.     On June 10, 2019, using a non-governmental e-mail address, I sent an e-mail to **ESSER's** GoldLine e-mail:

> The Gold Line, I saw your list and a few good reviews, so wanted to give this a try. can you do
>
> > Anavar 50mgtabs $90.00 x2
> > Winny 50mg 50 tabs $55.00 x1
>
> Let me know. I will probably just pay cash for this one.

105.     Through the course of this investigation, I have become aware that Anavar and "Winny" or Winstrol are anabolic steroids and are controlled substances. In response to this e-mail, **ESSER** informed me that he has a $200.00 minimum and "no cash in the mail." **ESSER** also provided a copy of the "TheGoldLine List" with a full listing of his current steroid inventory and prices.

106.     After exchanging several e-mails on **ESSER's** GoldLine e-mail, he declined to accept my offer of Western Union as a method of payment, but agreed

---

[30] In June of 2018, while conducting the consent search of **ESSER's** business/stash house in North Attleboro, MA, law enforcement agents seized a large stash of erectile dysfunction medication along with steroids and other substances packaged for distribution. The erectile dysfunction drugs Cialis and Viagra require a prescription from a medical professional.

accept payment by Zelle,[31] bitcoin or cash in the mail. **ESSER** clarified that he would not accept cash in the mail for small orders.[32]

107.    On June 25, 2019, I contacted **ESSER** and informed him of my decision to make a purchase using bitcoin. The order totaled $235. I asked **ESSER** if the advertised discount of 20% for customers using bitcoin was still available. It was. I requested **ESSER**'s cryptocurrency wallet address. Using his e-mail address associated with The Goldline, **ESSER**, sent me his cryptocurrency wallet address of ##############################PSKE.[33]

108.    On June 25, 2019, with the assistance of an HSI Undercover Agent (UCA), I used an HSI Boston undercover cryptocurrency wallet to send **ESSER** approximately 0.01653588 in bitcoin (the approximate equivalent of $188 USD at that time). I sent the HSI undercover funds to the cryptocurrency wallet address provided by **ESSER** in his e-mail. Following the payment, I contacted **ESSER** on TheGoldLine e-mail to let him know that the payment had been made. I also provided him with a physical address to send the steroids.

109.    USPIS Inspector Eli Hebert determined that on the following day, June 26,

---

[31] Zelle is a United States-based digital payments network owned by Early Warning Services, a private financial services company that is owned by Bank of America, BB&T, Capital One, JPMorgan Chase, PNC Bank, US Bank, Citibank and Wells Fargo. The Zelle service enables individuals to electronically transfer money from their bank account to another registered user's bank account (within the United States) using a mobile device or the website of a participating banking institution. The Zelle instant payment service was launched in 2017.

[32] The packaging I found in the trash was labeled $10,000.

[33] A bitcoin wallet address contains 26-35 alphanumeric characters and represents a destination for bitcoin digital currency payments.

2019, USPS databases reflected that **ESSER**'s "Click-N-Ship" account created 19 labels (Order ID Number 467004925).[34] One label was USPS tracking # 9405 5036 9930 0043 7977 44 that was generated on June 26, 2019 at 11:55 AM. The parcel bearing that tracking number was addressed to the undercover name and P.O. Box that I provided to **ESSER** while making the controlled purchase of steroids.

110.    USPS databases indicated that on June 27, 2019, at approximately 11:05 AM, the parcel with tracking # 9405 5036 9930 0043 7977 44 was first scanned at the South Attleboro, MA Post Office located at 775 Newport Avenue, Attleboro, MA.

111.    Inspector Hebert immediately went to that post office branch. He arrived at 11:40 AM and spoke with a USPS Clerk working there at that time. Inspector Hebert asked if anyone had recently dropped off several small flat rate Priority Mail parcels. The USPS Clerk stated there was a female with dark brown hair that had just dropped them off. The USPS Clerk further stated that this female usually comes in once a week and leaves a large white plastic garbage bag on the counter that contains several small flat rate Priority Mail boxes. The staff at this post office informed Inspector Hebert that this female is the only customer who comes into the post office with a large bag of small flat rate Priority Mail boxes in the manner that she does.

112.    Inspector Hebert showed the USPS Clerk a photo of **ALISON** from her Facebook page. In response, the USPS Clerk stated that the female who dropped off the

---

[34] The labels were paid for using a VISA credit card ending in 5707. According to BoA records, **ESSER** has a Visa Signature Bank of America credit card in his name ending in 5707.

mail parcels did in fact look like the person in the photograph.[35]

113.    On June 27, 2019, while at the South Attleboro Post Office, Inspector

Hebert observed twelve identical items with the same return address in Providence all

dropped off by **ALISON**. These twelve small flat rate Priority Mail boxes were

addressed to various locations around the United States. One of the twelve parcels

observed by Inspector Hebert bore tracking # 9405 5036 9930 0043 7977 44 and was

addressed to the undercover name and address I used when placing the order on

**ESSER's** GoldLine e-mail. These twelve mail parcels all had the same return address:

> REBECCA EDGE
> 183 LESTER ST
> PROVIDENCE, RI 02907-2467

114.    I reviewed the law enforcement database CLEAR and conducted an open

web search for the name REBECCA EDGE and found no such name listed at that

address or in the State of Rhode Island. Furthermore, on July 2, 2019, I drove to 183

Lester Street in Providence and observed that the house appeared to have sustained a

fire, was boarded up and clearly unoccupied. I also noticed that 183 Lester Street is

located only a few blocks away from **NIEVES'** residence at 164 Parade Street in

Providence. I took this photograph of 183-185 Lester Street in Providence on July 2,

2019:

---

[35] After this initial interaction between Inspector Hebert and the Clerk at the South Attleboro Post Office, the Clerks at this post office began notifying Inspector Hebert when **ALISON** came to the post office to mail these weekly shipments. Inspector Hebert was able to able to match several of these notifications with surveillance video confirming that **ALISON** and **MCLAUGHLIN** are the ones responsible for dropping off these bundles of mail parcels associated with **ESSER's** Click-N-Ship account.



115.    On July 1, 2019, Inspector Hebert and I retrieved the mail parcel

containing the steroids that I ordered from **ESSER** after it had arrived at the P.O. Box

that I provided to **ESSER**. I opened the mail parcel at the HSI Boston office. The parcel

contained three small sealed plastic bags. In each bag were 50 unmarked pills. Two bags

were labeled, "Anavar 50mg." The third bag was labeled "Winstrol 50mg."[36] All three

bags were labeled "Made in U.S.A." and "Rx Only." "Rx" is a symbol meaning

prescription:



---

[36] The labels were identical to those found in the trash at Subject Premises #1 and #2.



116.    One reason that drug dealers use Priority Mail is that the parcels can be remotely monitored by tracking number. According to USPS records, on July 2, 2019, at approximately 5:08 pm, tracking number # 9405 5036 9930 0043 7977 44 was queried to check its progress. I submitted a request to Comcast for subscriber information pertaining to the unique device or individual that generated that query for that tracking number on that date and at that time. Comcast responded to this request with the following:

| | |
|---|---|
| Subscriber Name: | DAVID **ESSER** |
| Service Address: | 9 FISHER ST APT 3 |
| | NORTH ATTLEBORO, MA 027601881 |
| Telephone #: | (781) 686-3111 |
| Type of Service: | High Speed Internet Service |
| Account Number: | 8773100100318746 |
| Start of Service: | Unknown |
| Account Status: | Active |
| IP Assignment: | Dynamically Assigned |

117.    After receiving the suspected steroids in the mail from **ESSER**, I submitted the tablets to the U.S. Customs and Border Protection (CBP) laboratory located in Chicago, Illinois for testing and analysis. On July 19, 2019, the CBP laboratory completed their analysis. The two small bags labeled "Anavar 50mg," which held round

69

purple-colored tablets, tested positive for Oxandrolone, an anabolic steroid and a

Schedule III controlled substance. The small bag labeled "Winstrol 50mg," which held

round light pink-colored tablets, tested positive for Stanozolol, an anabolic and

androgenic steroid that is also a Schedule III controlled substance. "Anavar" and

"Winstrol" and are brand names for Oxandrolone and Stanozolol.

118.    On October 9, 2019, I typed in the website *www.BrotherhoodOfPain.com* into

a web browser. I noticed that the layout and design of the home web page appeared to

have changed. According to several notes posted on the homepage, it appeared that the

website was constructed on September 20, 2019. Furthermore, the site stated that

another website *BrotherhoodOfPain.is* is attempting to duplicate *BrotherhoodOfPain.com* as

part of a potential scam, "The website you see at BrotherhoodOfPain.is (.IS) is a SCAM!

We have not affiliation with it and it is ran by the scammer\extortionist\blackmailer.

Stay away from that website!" A note on the homepage dated September 26, 2019,

redirects users to the new website address of *Brotherhood.is*.

119.    I then visited *Brotherhood.is* and noticed that this site has similar graphics

and layout to the original BrotherhoodOfPain.com website where **ESSER** advertised his

steroid products. I noticed that, although the site looked similar to the original site,

some of the links had changed or were missing. I logged into the site using my user

name and password. I then conducted a search for *thegoldline@protonmail.com* using the

website's search function. I received a result under the "Forum" tab of the website.

Under this Forum tab were numerous postings of users stating that they are back online

and glad that the site is up again. One of these posts from September 26, 2019, is from a

user believed to be **ESSER** using the username "TheGoldLine." This post is under a thread of posts titled "WELCOME BACK BOP's FAITHFUL THREAD." **ESSER**'s post simply stated, "I'm here." When I clicked on **ESSER**'s profile on the site, I noticed that The Gold Line List published by **ESSER** on the previous version of this **BOP** Forum was no longer available to view.

120.    Believing that **ESSER** may have moved his advertising to another forum, I then conducted a Google web search for **ESSER**'s GoldLine e-mail address. I observed that **ESSER's** GoldLine e-mail appeared on other bodybuilding and steroid web forums. For example, the website *www.musclechemistry.com* contains discussion forums that are designed similarly to those I found on the BOP Forum. On one thread I discovered on this website titled "List," I observed the user name "Thegoldline." This post stated the following: "Hello, we are Goldline Please email us for a full list. *thegoldLine@protonmail.com*." This post was dated July 31, 2019.

121.    Another thread from "Thegoldline" titled "20% off if using bitcoin" was posted on this same site on August 20, 2019. I clicked on this thread and observed that this thread read "20% off if using bitcoin *thegoldline@protonmail.comI*." My web search for **ESSER's** GoldLine e-mail also produced posting on other web forums dedicated to the use of steroids such as *www.anabolicsteroidforums.com* and *www.ironmagazineforums.com*. These sites both posted **ESSER**'s list of steroid products and related prices. However, the posts were dated from 2018. Based on these findings, I believe that **ESSER** is now requiring his customers to e-mail him at his GoldLine e-mail to obtain the latest list of steroids that he is offering and their related prices. I know

71

from working multiple drug investigations that drug traffickers will take measures to protect their online identity and obscure their drug trafficking activities.

122.   On October 9, 2019, I sent an e-mail to **ESSER's** GoldLine e-mail asking him for the most current list. Minutes after sending this request to **ESSER's** GoldLine e-mail, I received a response from **ESSER** with a list of steroids, prescription medications and non-controlled supplements. **ESSER** also sent me a link for the website *www.hardcore-underground.com.*[37] I then visited this website and discovered that it is another forum dedicated to "Bodybuilding with legal Sarms,[38] Anabolic Supplements, Testosterone and more." Like *BrotherhoodOfPain.com,* a/k/a *Brotherhood.is, Hardcore-underground.com* also requires users to register in order to make full use the site.

V.   SEIZURE WARRANTS

*Bank Accounts Used for Drug Trafficking*

123.   As part of this investigation, I obtained records from Bank of America (BoA) for **ESSER's** bank accounts and those accounts used by **ESSER's** co-conspirators in furtherance of this scheme. Based on the BoA records, I have determined that **ESSER** has multiple accounts, including a checking account (xxx-xxx0100) and a savings account (xxxxxxxxxx6673). Furthermore, **ESSER** maintains several BoA accounts under

---

[37] In July of 2019, Inspector Hebert photographed a piece of mail from the post office that was addressed to the Target Premises #1. This letter was from UPS in Monroe, WI and was addressed to "Hard-Core UG" of 9 Fisher Street, Apt 3, North Attleboro, MA 02760. This mail addressed to Hard-Core UG at the Subject Premises links **ESSER** to this steroid forum and the e-mail account thegoldline@protonmail.com.

[38] The term Sarms or SARMs refers to Selective Androgen Receptor Modulators, which are sometimes called "legal steroids." SARMs are composed of dietary supplements that are currently subject to clinical trials and have not been approved by the Food and Drug Administration. (https://www.nytimes.com/2018/04/12/well/move/sarms-muscle-body-building-weight-lifting-pill-supplements-safety.html)

the name Esser Properties, LLC, including checking account xxxxxxxx9446 and savings

account xxxxx7665. For the purpose of this affidavit, I will focus on **ESSER**'s checking

account ending in 0100 (Target Account #1) and his Esser Properties, LLC checking

account ending in 9446 (Target Account #2).[39] All of **ESSER**'s BoA accounts, including

his account under the name Esser Properties, LLC, list an address of 9 Fisher Street,

Apartment 3, North Attleboro, MA (Subject Premises #1).

*Target Account #1*

124.    Target Account #1 is **ESSER**'s primary checking account for receiving

proceeds from his drug sales and paying his accomplices.[40] Furthermore, this account is

the primary account used to wire proceeds to Hong Kong and other international

destinations to pay for his drug supply. **ESSER** also uses the funds in this account to

acquire real and personal property thereby laundering the proceeds of controlled

substance offenses.

125.    **ESSER** opened Target Account #1 on June 30, 2012, at a branch located in

North Attleboro, Massachusetts. My examination of the account detail revealed that

from June of 2018 through October of 2019, he received deposits totaling over

$1,348,000. The vast majority of these deposits came in the form of peer-to-peer

---

[39] **ESSER** has several other BOA accounts, including account xxxx xxxx 5137 and xxxx xxxx 0156.
However, my review has revealed that these accounts have limited financial activity.

[40] Target account #1 is used for receiving traditional payments at that financial institution. However,
**ESSER** encourages his customers to pay him in the cryptocurrency bitcoin as well. In fact, **ESSER** offers
his customers a 20% discount for payment in bitcoin. Because cryptocurrency payments are generally not
associated with a financial institution, it is difficult to calculate the volume of payments **ESSER** is
receiving in cryptocurrency.

payments (mostly Zelle transfers) from individuals I believe to be **ESSER's** steroid customers. In fact, from June of 2018 through October of 2019, **ESSER** received over 3,100 of these peer-to-peer deposits into Target Account #1. For the three most recent months of records provided by Bank of America (August, September and October of 2019), **ESSER** received approximately $100,000 in average monthly Zelle deposits into Target Account #1. The chart below details one day of transactions (June 14, 2019), as an example of a typical day of activity.

| Deposits into Target Account #1 June 14, 2019 | | |
|---|---|---|
| Transfer Type | Amount | Sender[41] |
| Zelle | $1,245 | Jason Batman |
| Zelle | $825 | Adan Plonski |
| Zelle | $505 | A, C |
| Zelle | $485 | Jason Nettles |
| Zelle | $410 | Sheisa Seda |
| Zelle | $370 | Richard M Pistone |
| Zelle | $345 | Richard M Pistone |
| Zelle | $340 | Michael Majeske |
| Zelle | $295 | Thomas Klutz |
| Zelle | $285 | Matthew R Johnson |
| Zelle | $285 | Mike Brennen |

---

[41] A web search of several of the less common names of individuals sending money to **ESSER** revealed that some of these individuals are involved in professional body building or other athletics.

| Zelle | $245 | Vittorio Violante |
|---|---|---|
| Zelle | $210 | Sadio Spencer |
| Totals | $5,845 | 13 Customers |

126.   I believe that these peer-to-peer payments to **ESSER** are from steroid

customers for a number of reasons including:

- **ESSER** instructed me to pay him for anabolic steroids using Zelle when I
  conducted an undercover drug purchase from him.

- The names of the individuals listed on the packages believed to contain
  steroids sent by **ESSER** or his accomplices are the same names that I have
  observed sending **ESSER** money transfers through Zelle.[42]

- Some of the Zelle payments to Target Account #1 were not to **ESSER**
  personally, but to his known online steroid trafficking business, The Gold
  Line.[43]

- The payments sometimes contained notations as to the purpose of the
  transaction. For example:

  - August 20, 2018: payment sent to "Goldline" for an "order";

  - September 10, 2018:  $235 for "Winter Bulking Program";

---

[42] For example, on June 27, 2019, Inspector Hebert observed a mail parcel addressed to Brady Dwyer of
Lacey, Washington. I observed that on several occasions Brady Dwyer sent money to **ESSER** using Zelle
including $205 deposited into Target Account #1 made on May 28, 2019. Inspector Hebert also noted a
USPS mail parcel sent from **ESSER** to Tom Mackey of Sioux City, IA. I observed this same name deposit
payments to Esser via Zelle, including a $240 deposit into Target Account #1 made on June 26, 2019.
There are numerous other examples where Inspector Hebert physically observed mail parcels believed to
contain steroids sent through the mail to named recipients who also make payments into Target Account
#1 using Zelle.

[43] For example, on November 23, 2018, **ESSER** received a Zelle credit of $225 into Target Account #1 from
an individual named Susanna Jacobs. The sender listed the recipient as "Thegoldline." On November 1,
2018, Esser received a credit of $405 by Zelle transfer from an individual named Robert Henderson. This
transfer into Target Account #1 listed the recipient as "TheGoldLine."

- **ESSER** also received payments on various dates for "Training Assistance," "Vitamins," "Training and Nutrition," "Test Pills," and "Offseason Prep."

127.    Even more notable was a March 12, 2019, payment of $245 via Zelle into Target Account #1 from an individual named John Silva. In the transaction notes, Silva listed the payment for "3 tren 2 deca." I know from working this investigation that "tren" is a name used for Trenbalone and "deca" is a name used for Nandrolone Decanoate. Both drugs are anabolic/androgenic steroids and are controlled substances. According to several anabolic steroid forum websites that I reviewed, tren and deca can be used together to increase muscle mass. Furthermore, reviewing the product list that **ESSER** e-mailed to me (when I purchased steroids from him) I noticed that he listed both tren and deca for sale. Silva's purchase note specified three tren and two deca. Presumably, Silva was ordering three orders of tren and two orders of deca for a total of $245. **ESSER**'s price list included "TREN ENTH 200MG $55.00" and "DECA 250MG $40." A purchase of three orders of tren and two orders of deca results in a total price of $245, the exact amount of this Zelle transfer.

128.    The examination of records associated with Target Account #1 revealed that this account is used to pay for several credit cards. BoA provided statements for **ESSER**'s credit cards linked to this account. These records revealed that **ESSER** used his drug proceeds to support lavish spending habits. **ESSER**'s Bank of America Visa Signature card ending in 5707 appears to be the card used most frequently for **ESSER**'s

personal expenses.[44] For example, BoA records reveal that in April of 2019, this card was used to make approximately $18,680 in purchases. Some of these purchases include the following:

| April 2019 ESSER Purchases Using Credit Card 5707 | | |
|---|---|---|
| Date | Amount | Vendor |
| 04/12/19 | $3,676.26 | Louis Vuitton |
| 04/12/19 | $1,678.12 | Louis Vuitton |
| 04/17/19 | $702.81 | Neiman Marcus |
| 04/18/19 | $702.81 | Neiman Marcus |
| 04/18/19 | $1,883.44 | Versace USA |
| 04/19/19 | $1,734.38 | Gucci |

129.   **ESSER**'s spending patterns reveal that he consistently spends large amounts of drug proceeds on travel, dining, and retail purchases. For example, in July of 2019, **ESSER** used this same card to make over $22,000 in purchases, including a purchase totaling over $1,400 at a footwear store, nearly $700 at a gold retailer, over $1,200 at a luxury hotel and over $1,800 at Versace. Furthermore, this same card was used to make purchases in furtherance of **ESSER**'s drug trafficking endeavors. This card regularly pays for **ESSER**'s USPS Click-N-Ship mailing expenses, medical lab

---

[44] **ESSER** regularly uses additional credit cards associated with his BoA Target Account #1 for lavish spending. For example, **ESSER** used credit card ending in 9264 to spend over $7,500 at Zales jewelry store in late 2018.

supply companies and industrial packaging suppliers. BoA also provided biographic details that **ESSER** provided when setting up his credit cards. This information lists **ESSER**'s name, date of birth, address and also lists his employer at Esser Properties. He lists his position title as "HEALTH FITNESS" and provided an annual income of $50,000.

130.    My examination of the debits associated with Target Account #1 revealed that **ESSER** makes consistent payments to several international accounts in furtherance of his steroid trafficking operation. From July 24, 2018 through October 29, 2019, **ESSER** sent 41 international wire transfers totaling over $127,000 to bank accounts located in Hong Kong, Taiwan, and Australia. The majority of these transfers were to Hong Kong. I know from working this investigation and others that Hong Kong is a major source of steroids illegally imported into the United States. Additionally, fourteen wire transfers were sent to "SYNTHETEK INDUSTRIES PTY LTD" located in Australia. I conducted a web search for this company and viewed their website at www.synthetek.com. This website advertises the sale of seven different products used for muscle development, body fat reduction and liver protection. I know from working this investigation that these types of products are often used in conjunction with illegal steroids. Synthetek Industries advertises:

> From a beginning, heavily focused on providing bodybuilding and fitness nutritional products that do work, the company has now positioned itself as the fastest growing nutritional supplement company in the world.

Another notable debit occurred on February 19, 2019, where **ESSER** paid $334.00 to a foreign-based company called "LAB MAX".[45] A Google web search for LAB MAX revealed that this is a company that specializes in the sale of anabolic steroid test kits. The company's web site extolls the quality of several of their test kits that are designed to inform the user of the purity of various types of steroids. Based on these findings, I believe that **ESSER** is also using Target Account #1 to pay his foreign steroid suppliers through international wire transfers.

*Transfers between Target Account #1 and Target Account #3*

131.    My review of **ESSER**'s debits from Target Account #1 also revealed that he makes regular payments through Zelle to several individuals with whom he conspires to facilitate his steroid trafficking scheme.

132.    A number of debits from Target Account #1 are to Mason **NIEVES** in which the recipient of the transfers was labeled as either "Mason" or "Mason Nieves." I have observed **NIEVES** assisting **ESSER** by carrying a large box into the stash house (Subject Premises #2) and I have observed **NIEVES's** vehicle regularly parked on the street in front of Subject Premises #1 and #2. In reviewing **NIEVES**' Target Account #3, I noticed that he received a large number of cash deposits from unknown sources in late 2018 and early 2019. For example, in October of 2018, **NIEVES** deposited $4,941 in cash into Target Account #3. Again in January of 2019, **NIEVES** deposited $5,889 into Target Account #3. In February of 2019, I noticed that **NIEVES** began receiving Zelle payments

---

[45] I know that this is a foreign-based company because **ESSER** incurred an international transaction fee from BoA for this purchase.

into Target Account #3 from **ESSER**, using Target Account #1 as further detailed in the table listed below. I further noticed that once **NIEVES** began receiving Zelle payments from **ESSER**, these cash payments diminished. For example, from March through May of 2019, **NIEVES** only had one cash deposit of $440 into Target Account #3. Based on what I have learned in this investigation and knowing that **NIEVES** works for **ESSER** in the distribution of controlled substances, I believe that up until February of 2019, **NIEVES** was mainly being paid in cash by **ESSER**. Beginning in February of 2019, **ESSER** began paying **NIEVES** via Zelle transfers instead of cash. Although it is unclear why this payment arrangement changed, I know from purchasing steroids directly from **ESSER** in June of 2019, he informed me that he does not accept cash in the mail for smaller orders and preferred Zelle or cryptocurrency. I believe that **ESSER** began discouraging his customers from paying cash to avoid the potential risk of theft or possible detection by law enforcement. This belief is further substantiated by the fact that **ESSER** continues to promote a 20% discount to customers who are willing to pay him in bitcoin (cryptocurrency).

133.     In reviewing **NIEVES**'s account activity for Target Account #3, I also noticed that, in addition to receiving Zelle transfers from **ESSER**, **NIEVES** also made Zelle transfers back to **ESSER**. Although these transfers from **NIEVES** to **ESSER** occurred with less frequency, I believe that these payments to **ESSER** may represent cash proceeds from the sale of steroids that **NIEVES** collected on behalf of **ESSER**. In short, I believe that **NIEVES** works for **ESSER** and is paid by **ESSER** from the drug proceeds made in cash and proceeds maintained in the Target Account #1.

134.     Payments to **NIEVES** began in February of 2019, and have occurred on a regular basis through September of 2019. From February 2019 through September of 2019, **ESSER** used Zelle to deposit $39,488 into **NIEVES's** BoA account (Target Account #3). I believe that the deposits represent payments to **NIEVES** for his part in the steroid trafficking operation. In addition to his work at the stash house, I believe that **NEIVES** helped **ESSER** with the collection of drug debts by laundering them through Target Account #3.

135.     I saw a large number of Zelle deposits made into Target Account #3 and a lesser number of larger fund transfers from **NIEVES's** account (Target Account #3) to **ESSER's** account (Target Account #1). Based on the cash and Zelle deposits from various sources going into Target Account#3 and transfers of funds from Target Account #3 to Target Account #1, I believe that **NIEVES** was collecting small cash payments made to **ESSER** from steroid customers and then transferring the funds in larger amounts to **ESSER** in Target Account #1. I believe that **ESSER** pays **NIEVES** via Zelle transfers from Target Account #1 to Target Account #3. My review of Target Account #3 revealed no consistent source of legitimate income for **NIEVES**, only transfers from Target Account #1 and, although less frequent, unexplained cash deposits. The chart below shows the deposits made from **ESSER's** Target Account #1 into **NEIVES's** Target Account #3:

| Transfers from **ESSER** Target Account #1 to **NIEVES** Target Account #3 | |
|---|---|
| Transfer Date | Amount |
| 02/08/19 | $60 |
| 02/11/19 | $1260 |
| 02/14/19 | $100 |
| 03/01/19 | $920 |
| 03/04/19 | $400 |
| 03/05/19 | $200 |
| 03/06/19 | $1500 |
| 03/11/19 | $200 |
| 03/11/19 | $1175 |
| 03/13/19 | $200 |
| 03/13/19 | $570 |
| 03/15/19 | $780 |
| 03/15/19 | $850 |
| 03/20/19 | $1200 |
| 03/22/19 | $871 |
| 03/25/19 | $1500 |
| 03/29/19 | $200 |
| 04/03/19 | $1387 |
| 04/10/19 | $1000 |

| | |
|---|---|
| 04/17/19 | $1290 |
| 05/01/19 | $1985 |
| 05/02/19 | $1755 |
| 05/06/19 | $500 |
| 05/06/19 | $500 |
| 05/08/19 | $680 |
| 05/13/19 | $2200 |
| 05/15/19 | $1500 |
| 05/17/19 | $200 |
| 05/22/19 | $1500 |
| 05/24/19 | $400 |
| 05/30/19 | $500 |
| 06/07/19 | $1200 |
| 06/10/19 | $1370 |
| 06/13/19 | $850 |
| 06/14/19 | $1650 |
| 06/18/19 | $865 |
| 06/20/19 | $1100 |
| 06/21/19 | $700 |
| 07/11/19 | $1000 |
| 07/24/19 | $1100 |

| | |
|---|---|
| 08/20/19 | $740 |
| 09/11/19 | $1120 |
| 09/18/19 | $410 |
| Total | $39,488 |

*Transfers between Target Account #1 and Target Account #4*

136.    The largest individual recipient of funds from **ESSER's** Target Account #1 is his current wife, Regiane Celi De Moraes Delesposti Vieira a/k/a Esser (Vieira-Esser). From August of 2018 through September of 2019, **ESSER** sent $43,680 to her BoA account ending in 6833 (Target Account #4).[46] Vieira-Esser does not appear to have any consistent source of income coming into this account other than deposits of drug proceeds from Target Account #1. [47] Vieira-Esser primarily used the drug money put into this account to pay credit card bills for somewhat lavish spending at high-end retailers. The chart below shows the deposits made from Target Account#1 into Target Account #4:

| Transfers from Target Account #1 to Target Account #4 | |
|---|---|
| Transfer Date | Amount |
| 08/22/18 | $1,000 |

---

[46] In addition to the transfers from Target Account #1 to Target Account #4, I also observed that **ESSER** used Target Account #2 to send Vieira-Esser $1,000 in September of 2019.

[47] There were a limited number of cash deposits. For June and July of 2019, Vieira-Esser relied mainly upon cash deposits into her BoA account to pay for her spending on credit cards. The source of the cash is unknown.

| | |
|---|---|
| 08/24/18 | $500 |
| 08/27/18 | $2,000 |
| 09/04/18 | $500 |
| 09/17/18 | $2,500 |
| 10/01/18 | $2,500 |
| 10/19/18 | $1,000 |
| 10/26/18 | $2,000 |
| 11/05/18 | $1,000 |
| 11/13/18 | $1,000 |
| 11/16/18 | $1,000 |
| 11/26/18 | $1,000 |
| 12/03/18 | $1,000 |
| 12/07/18 | $1,000 |
| 12/17/18 | $1,000 |
| 12/24/18 | $1,000 |
| 12/31/18 | $1,000 |
| 01/04/19 | $1,000 |
| 01/14/19 | $1,000 |
| 01/22/19 | $1,000 |
| 01/28/19 | $1,000 |
| 02/04/19 | $1,000 |

| | |
|---|---|
| 02/08/19 | $1,000 |
| 02/19/19 | $1,000 |
| 02/25/19 | $1,000 |
| 02/28/19 | $480 |
| 03/04/19 | $1,000 |
| 03/11/19 | $1,300 |
| 03/18/19 | $1,000 |
| 03/25/19 | $1,000 |
| 03/29/19 | $1,400 |
| 04/01/19 | $2,500 |
| 04/05/19 | $1,000 |
| 04/15/19 | $1,000 |
| 05/06/19 | $1,000 |
| 05/14/19 | $1,000 |
| 05/20/19 | $1,000 |
| 09/23/19 | $1,000 |
| Total | $43,680 |

*Transfers between Target Account #1 and Target Account #5*

137.   Another frequent recipient of funds from **ESSER**'s Target Account #1 is

Ana P. Menezes. Menezes is a current resident of Somerset, Massachusetts and,

86

according to law enforcement database checks, formerly resided with **ESSER** at the Subject Residence #1. On September 10, 2018, **ESSER** first used Zelle to transfer $1,000 to Menezes's BoA account # xxxx-xxxx-2144. Between September of 2018 through October of 2019, **ESSER** transferred over $40,000 in illegal proceeds from Target Account #1 to Menezes' Target Account #5. On May 13, 2019, Menezes transferred $22,000 from Target Account #5 to her BOA Savings Account xxxx-xxxx-9775 (Target Account #6). Prior to this transfer from Target Account #5 to Target Account #6, Menezes had a balance of $0 in Target Account #6. In September of 2019, Menezes transferred another $1,000 from Target Account #5 to Target Account #6.[48] There are no other deposits made into Target Account #6 other than the transfers from Target Account #5. The chart below shows the deposits made from Target Account#1 into Target Account #5:

| Transfers from Target Account #1 to Target Account #5 | |
|---|---|
| Transfer Date | Amount |
| 09/10/18 | $1,000 |
| 10/10/18 | $1,000 |
| 11/09/18 | $200 |
| 11/13/18 | $1,000 |
| 11/26/18 | $800 |

---

[48] According to BoA records, Menezes made several cash withdrawals from Target Account #6 in August and September of 2019 totaling $5,000.

| | |
|---|---|
| 12/06/18 | $850 |
| 01/17/19 | $2,000 |
| 01/22/19 | $363 |
| 02/04/19 | $1,000 |
| 02/13/19 | $1,000 |
| 03/06/19 | $1,000 |
| 04/11/19 | $2,500 |
| 04/15/19 | $500 |
| 04/29/19 | $1,500 |
| 05/08/19 | $1,800 |
| 05/13/19 | $1,000 |
| 05/17/19 | $600 |
| 05/31/19 | $1,000 |
| 05/31/19 | $1,000 |
| 06/27/19 | $500 |
| 07/01/19 | $1,500 |
| 07/05/19 | $500 |
| 07/12/19 | $500 |
| 07/15/19 | $160 |
| 07/19/19 | $500 |
| 07/22/19 | $340 |

| | |
|---|---|
| 07/26/19 | $500 |
| 07/29/19 | $370 |
| 08/02/19 | $500 |
| 08/09/19 | $500 |
| 08/12/19 | $800 |
| 08/16/19 | $500 |
| 08/16/19 | $1,100 |
| 08/30/19 | $2,500 |
| 09/06/19 | $500 |
| 09/11/19 | $200 |
| 09/13/19 | $500 |
| 09/20/19 | $500 |
| 09/23/19 | $600 |
| 09/25/19 | $300 |
| 09/27/19 | $500 |
| 10/04/19 | $500 |
| 10/11/19 | $500 |
| 10/18/19 | $500 |
| 10/23/19 | $1,500 |
| 10/25/19 | $500 |
| 10/28/19 | $300 |

| 10/31/19 | $3,000 |
| Total | $40,783 |

138.    While reviewing transactions in Target Account #1, I also observed that **ESSER** regularly makes large cash withdrawals from this account. In fact, from June 28, 2018 through July 11, 2019, **ESSER** withdrew $242,462 in cash from this account. Furthermore, on several occasions, **ESSER** appeared to be intentionally avoiding currency reporting requirements when making the withdrawals.[49] For example, on the dates of June 28, 29 and July 2, 2018, **ESSER** withdrew $9,000 in cash each day from Target Account #1. Again, on March 26, 27, and 28 of 2019, **ESSER** withdrew $9,000 daily from this same account. **ESSER** is likely conducting these withdrawals in this manner to avoid currency reporting requirements and to conceal his money laundering activities.

*Transfers from Target Account #1 to Target Account #2 for the Purchase of Real Estate*

139.    **ESSER**'s BoA account ending in 9446, is an account listed under "Esser Properties, LLC" at 9 Fisher Street, Apartment 3, North Attleboro, MA 02760 (Target Account #2). This account caught my attention due to some large transfers of drug proceeds that **ESSER** made from Target Account #1 into this account. In roughly six months from November of 2018 to June of 2019, **ESSER** transferred $87,940 between these accounts as seen in the graph listed below. **ESSER** opened Target Account #2 in

---

[49] Federal law requires financial institutions to report currency (cash or coin) transactions over $10,000 conducted by, or on behalf of, one person, as well as multiple currency transactions that aggregate to be over $10,000 in a single day. (https://www.fincen.gov.)

the name of Esser Properties, LLC in September of 2017, just after he incorporated that company in the state of Pennsylvania. This is the same month that he purchased his first property in York, PA using drug proceeds. I believe that **ESSER** opened Target Account #2 for the sole purpose of laundering his drug proceeds and investing these proceeds in real estate transactions.

| Transfers from Target Account #1 to Target Account #2 | |
| --- | --- |
| Transfer Date | Amount |
| 11/26/18 | $,2000 |
| 02/05/19 | $9,000 |
| 02/21/19 | $5,540 |
| 02/21/19 | $5,000 |
| 03/01/19 | $3,400 |
| 04/08/19 | $8,000 |
| 05/28/19 | $25,000 |
| 06/05/19 | $30,000 |
| Total | $87,940 |

140.    The primary purpose of the transfer of funds from Target Account #1 to Target Account #2 was to pay for and maintain real estate that **ESSER** purchased in York, PA with drug proceeds and thereby launder the drug money. For example:

   a.   In February of 2019, **ESSER** transferred $19,540 from Target Account #1 to Target Account #2. **ESSER** used these funds in Target Account #2, to pay:

91

- A home inspection and appraisal company ($9,657.80) for work done at 460 S. Pershing Ave., York, PA[50];
- The York, PA City Treasurer for taxes on properties that he owns at 460 S Pershing Ave, 542 Queen Street, 929 W. Poplar Street, 437 Cooper Place, 614 S. Queen Street and 520 S. Queen Street, all in York, PA; and
- A property maintenance company ($15,234) on October 23, 2019.

b. The $11,400 in funds transferred in March and April of 2019 appeared to be used to write checks for renovations made to properties **ESSER** owns in York because **ESSER** listed the addresses on the checks that he wrote from Target Account #2 to home repair and renovations companies.

c. The two largest transfers made from Target Account #1 to Target Account #2 were made on May 28th and June 5th of 2019. Both of these transfers were made to purchase properties in York, Pennsylvania, as explained in paragraphs 128 d and e.

d. **ESSER** transferred $25,000 in drug proceeds into Target Account #2 on May 28, 2019. Two days later, on May 30, 2019, **ESSER** wrote a check for $25,000 against this account to an individual named Chong Su Kim for "656 E. Princess St." I reviewed the York County (PA) Real Estate Assessment Database for this property and discovered that on June 21, 2019, Esser Properties LLC purchased 656 E Princess St, York, PA for $25,000 from Kim Chong Su & Abboud Ray. Furthermore, on October 7,

---

[50] On December 3, 2019, I observed that 460 S. Pershing Avenue is being advertised on the "Yorktowne Property Shoppe" property management website www.ypsrentals.managebuildings.com as being available for rent at $945 per month. The website lists this property as a "Beautifully renovated five bedroom home for rent…"

2019, **ESSER** wrote a check from Target Account #2 in the amount of $10,000 to "Advanced Property Maintenance LLC" for "656 E. Princess St."

e. On June 5, 2019, after transferring $35,000 in drug proceeds from Target Account #1 to Target Account #2, **ESSER** wrote a check for $30,000 on the same day to Chong Su Kim and Ray Abboud for "561 W. Princess." A review of the York County Real Estate Assessment Database revealed that on June 21, 2019, this property was sold by "Abboud Ray & Kim Chong Su" to Esser Properties LLC for $30,000.

*Other York, PA Properties*

141.    After making the discovery that **ESSER** purchased these two properties in York, Pennsylvania, using the proceeds of drug trafficking, I conducted a further review of the York County Real Estate Assessment Database for similar transactions. The following graph represents all York County, PA real estate transactions made by Esser Properties, LLC, that I have uncovered:

| Date | Property | Seller | Buyer | Amount | Payment Origin |
|---|---|---|---|---|---|
| 09/01/2017 | 929 W. Poplar St. | Gurreri Christine M & Harold E | Esser Properties LLC | $30,100 | Wire transfer and cash withdrawal for partial payment from TA#1 |
| 11/28/2017 | 542 S. Queen Street | CR Property Group LLC | Esser Properties LLC | $28,500 | Unknown |
| 12/26/2017 | 520 S. Queen Street | Kim Chong Su & | Esser Properties LLC | $19,000 | Check from TA#2 after cash deposits |

| | | Abboud Ray | | | |
|---|---|---|---|---|---|
| 01/08/2018 | 437 Cooper Place | Kim Chong Su & Abboud Ray | Esser Properties LLC | $17,000 | Check from TA#2 after cash deposits |
| 03/12/2018 | 460 S. Pershing Avenue | Kim Chong Su & Abboud Ray | Esser Properties LLC | $25,000 | Check from TA#2 following cash deposits |
| 03/12/2018 | 614 S. Queen Street | Kim Chong Su & Abboud Ray | Esser Properties LLC | $25,000 | Check from TA#2 following cash deposits |
| 06/12/2019 | 625 Girard Rear Avenue | 500 Inc. | Esser Properties LLC | $15,000 | Unknown |
| 06/21/2019 | 656 E. Princess Street | Kim Chong Su & Abboud Ray | Esser Properties LLC | $25,000 | Check from TA#2 after transfer from TA#1 |
| 06/21/2019 | 561 W. Princess Street | Kim Chong Su & Abboud Ray | Esser Properties LLC | $30,000 | Check from TA#2 after transfer from TA#1 |
| 10/01/2019 | 1142 E. Poplar Street | Joseph H. and Lisa A. Dodson | Esser Properties LLC | $55,000 | Wire transfer from TA#1 to third party company |
| 01/03/2020 | 326 Frederick Court | George D Zahos | Esser Properties LLC | $65,000 | Wire transfer from TA#1 to third party company |
| Totals | | | | $334,600 | |

142.    In addition to transferring suspected drug proceeds from Target Account

#1 into Target Account #2, I also observed that **ESSER** deposited large amounts of cash into Target Account #2. Based on the facts learned during the course of this investigation including the fact that **ESSER** has no consistent source of legitimate income to account for those deposits and accepted cash payments for the sale of illegal steroids, I believe that these large unexplained cash deposits into Target Account #2 were from the proceeds of illegal sales of controlled substances. The chart below outlines these large cash deposits into Target Account #2:

| Cash Deposits Made into Target Account #2 | |
|---|---|
| Date | Cash Deposit |
| 11/14/2017 | $4,300 |
| 11/17/2017 | $8,610 |
| 11/21/2017 | $9,000 |
| 11/22/2017 | $8,980 |
| 12/18/2017 | $8,900 |
| 12/19/2017 | $8,250 |
| 01/12/2018 | $9,780 |
| 01/22/2018 | $9,600 |
| 01/29/2018 | $8,035 |
| 02/14/2018 | $8,950 |
| 02/15/2018 | $8,585 |

| 03/02/2018 | $5,590 |
|------------|--------|
| **Total** | **$98,580** |

143.     As this graph points out, in an approximately four-month period, **ESSER** deposited nearly $100,000 in drug proceeds into Target Account #2. Most of these cash deposits were for amounts slightly below the $10,000 mark, the mandatory FinCEN reporting threshold for monetary transactions as discussed previously in this affidavit. I believe **ESSER** intentionally conducted multiple cash deposits below $10,000 to avoid currency reporting requirements.

144.     The purpose of these cash deposits into Target Account #2 appeared to be mainly for the purpose of purchasing real estate in York, PA.

a)   **ESSER** wrote a check for $19,000 from Target Account #2 on November 22, 2107 to "Ray Abboud and Chong Su Kim." In the note line for this check, **ESSER** wrote "520 S. Queen St." York County Assessor records show that **ESSER** purchased the home located at 520 S. Queen Street in York, Pennsylvania, on December 26, 2017, for $19,000. The check for this property cleared on December 7, 2017. I believe this demonstrated that **ESSER** used cash drug proceeds that he deposited into Target Account #2 to purchase 520 S. Queen Street in York, PA.[51]

---

[51] On December 3, 2019, the property located at 520 S Queen Street in York, Pennsylvania, was listed for rent on the website www.apartments.com. The entry for this property states the following: "Newly renovated 3-4 bedroom home for rent in York City! Check out the granite counters, brand new kitchen and brand new furnace!" The website states that the property is managed by Yorktowne Property Shoppe, LLC. **ESSER** makes payments to Yorktowne Properties using Target Account #2. For example,

b) On December 20, 2017, **ESSER** wrote another check to "RAY Abboud & Chong SuKim" in the amount of $17,000, from Target Account #2. This check listed the note "437 Cooper Place." This check cleared on December 27, 2017. Public records show that on January 8, 2018, **ESSER** purchased the property at 437 Cooper Place for $17,000 from Abboud and Kim.

c) On February 16, 2018, **ESSER** wrote a check from Target Account #2 for $25,000, to Abboud and Kim for "460 S. Pershing Ave." On this same date, **ESSER** wrote another check from Target Account #2 to Abboud and Kim for $25,000, for 614 S. Queen Street. Both of these checks cleared on February 27, 2018. Assessor records show that **ESSER** purchased these properties for $25,000 each on March 12, 2018, from Abboud and Kim.

145.     Bank records for **ESSER**'s accounts for September and October of 2019, show that on September 27, 2019, he sent a wire transfer from Target Account #1, his main depository for drug proceeds, to the Susquehanna Abstracting Company. This wire was in the amount of $58,437.61. I conducted a web search of this company and discovered that this is a Title Company associated with the law offices of Murphy, Butterfield & Holland, P.C. in York, Pennsylvania, that specializes in title insurance and other real estate services. Following this discovery, I conducted a search of the York County Assessor's Office database and discovered that on October 1, 2019, **ESSER**, under the name of **ESSER** Properties, LLC, purchased the property located at 1142 E

---

on May 30, 2019, **ESSER** sent $800 to Yorktowne Properties. Based on these facts, I believe that Yorktown manages some of **ESSER**'s properties in York, Pennsylvania.

Poplar Street in York, Pennsylvania, for $55,000. **ESSER** purchased this house from

Joseph and Lisa Dodson. Based on these facts, I believe that **ESSER** used drug proceeds

from Target Account #1 to pay a second party, the Susquehanna Abstracting Company,

for the property located at 1142 E Poplar Street in York, Pennsylvania.

146.    Banking records reveal that on December 27, 2019, **ESSER** sent a wire

transfer in the amount of $66,087.24 from Target Account #1 to a law firm based in

York, PA. According to this law firm's website, they share the same address, 17 E

Market Street in York, PA, where **ESSER** registered his business Esser Properties, LLC

in 2017. I visited this law firm's website and observed that they claim to specialize in

real estate among other legal practices. Based on these facts, I believe that **ESSER** used

illegally acquired proceeds to pay for the property located at 326 Frederick Court in

York, which was purchased on January 3, 2020, shortly after this wire transfer was

completed.

147.    I also observed that **ESSER** used funds from Target Account #1 to help

purchase the property located at 929 W Poplar Street in York, in September of 2017. This

appears to be the first property that **ESSER** purchased in York, which he currently still

owns. BoA records for Target Account #1 revealed that on July 31, 2017, approximately

one month prior to the purchase of this property, **ESSER** withdrew $9,000 in cash. On

August 31, 2017, one day prior to the purchase of this property, **ESSER** sent a wire

transfer of $3,539.36 to the Susquehanna Abstracting Company. There is a note listed in

the wire transfer "9 29 WEST POPLAR ST YORK PA."

148.    In all, during the course of the previous two years, **ESSER** purchased

eleven properties for a total of $334,600 in York, Pennsylvania. Based on the facts adduced in this investigation, I believe that all eleven of these properties were purchased using funds that **ESSER** earned from the illegal sale of steroids.

*Cryptocurrency Activity*

149.    As previously stated herein, all verified and confirmed cryptocurrency transactions are recorded and in a public ledger known as the blockchain. I reviewed the blockchain at www.blockchain.com and observed my cryptocurrency transaction with **ESSER** that occurred on June 25, 2019. While reviewing this transaction, I clicked on **ESSER**'s cryptocurrency wallet address and observed that this particular wallet only had five total associated transactions. The last of these transactions occurred on July 18, 2019, when the cryptocurrency in that wallet was transferred to another wallet with the address of xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxPRy7.

150.    I then clicked on the address where **ESSER** sent the funds that I sent to him and discovered that this particular address had over 1,090 transactions between when this wallet began receiving funds on October 16, 2017 and October 18, 2019. As of October 18, 2019[52], this wallet received approximately 237.77454616 BTC. As of October 18, 2019, at approximately 5:28 PM, this was the equivalent of approximately $1,888,840.57.  It is unknown if **ESSER** controls this secondary wallet.

151.    I believe that based on the fact that **ESSER** transferred the proceeds that I sent to him to another cryptocurrency account with a large volume of transactions, he

---

[52] According to the blockchain, this was the total amount that this wallet received as of 5:28 PM on October·18, 2019.

controls multiple cryptocurrency wallet accounts and uses these wallets to receive and launder the proceeds earned from the sale of controlled substances.[53]

*Purchase of the Target Vehicles Using Proceeds from the Target Accounts*

152.    **ESSER** purchased several vehicles using money earned from the sale of illegal controlled substances. Specifically, **ESSER** has purchased four vehicles used by him and his wife, Vieira-Esser. While conducting surveillance in this investigation, I have observed **ESSER** driving two different vehicles:

- a white 2019 Toyota Camry bearing MA registration 6GW891 registered to him at Subject Premises #4; and

- a blue 2017 Chevrolet Corvette bearing MA registration 1DAA34 also registered to him at Subject Premises #4.

153.    In addition to these two vehicles, Inspector Hebert informed me that while conducting surveillance of Subject Premises #1 in September of 2019, he also observed a third vehicle, a 2016 black BMW bearing MA registration 9EX366, registered to "Regiane Vieira" at Subject Premises #1.

154.    A review of Target Account #1 reveals that **ESSER** made several payments for the Toyota Camry using proceeds from his steroids trafficking scheme. According to Massachusetts Department of Transportation (DOT) records, **ESSER** purchased this Toyota Camry on March 8, 2019 from Boch Toyota South located in

---

[53] Based on an analysis of these wallets and the accounts publicly available transactional data, I believe that the cryptocurrency wallet **ESSER** provided to me referenced in this affidavit may be associated with the cryptocurrency exchange 'Coincola'. Coincola is an exchange based in Hong Kong that allows individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies. Attempts to contact Coincola to inquire about compliance with requests for information have remained unanswered.

North Attleboro, Massachusetts. DOT records list the sales price as $37,758. At the time of purchase, **ESSER** traded in a 2017 Toyota Corolla valued at $8,132. This brought the amount owed for the 2019 Toyota Camry down to $29,626. With taxes and other fees, this 2019 Toyota Camry cost $32,145.13. On March 22, 2019, **ESSER** wrote a check (check #8729) drawn against Target Account #1 to Toyota Financial in the amount of $25,000. These funds were withdrawn from Target Account #1 on March 25, 2019. The chart below shows the payments made from Target Account 1 towards the Toyota Camry:[54]

| Esser Payments Towards 2019 Toyota Camry | | | |
|---|---|---|---|
| Date | Payment | Payment Type | Recipient |
| 03/25/19 | $25,000 | BOA Bill Pay | Toyota Financial |
| 04/12/19 | $2,000 | BOA Bill Pay | Toyota Financial |
| 05/15/19 | $2,500 | BOA Bill Pay | Toyota Financial |
| Totals | $29,500 | | |

155.    **ESSER** also used drug proceeds from Target Account #1 to pay for his 2017 Chevrolet Corvette. According to Massachusetts DOT records, **ESSER** purchased this Chevrolet Corvette on May 2, 2019, from a private individual located in Bear, Delaware. DOT records list the sales price as $43,950, and list no lien on the vehicle. Although Target Account #1 does not show any bank transfers directly to this individual, **ESSER** did make numerous large cash withdrawals during this period. In late March of 2019, **ESSER** made three separate $9,000 cash withdrawals from Target

---

[54] A review of a Car Fax Report associated with this vehicle reveals that when the vehicle was serviced on August 29, 2019, in North Attleboro, Massachusetts, the odometer reading was 4,726.

Account #1 totaling $27,000. In April of 2019, **ESSER** made four $9,000 cash withdrawals from Target Account #1 totaling $36,000.[55] Based on the large number of cash withdrawals leading up to the purchase of this Corvette, I believe that **ESSER** used drug proceeds from Target Account #1 to pay for this vehicle[56].

| Cash Withdrawals from Target Account #1 Believed to have been used to Pay for the 2017 Chevrolet Corvette ||
| Date | Payment |
| --- | --- |
| 03/26/2019 | $9,000 |
| 03/27/2019 | $9,000 |
| 03/28/2019 | $9,000 |
| 04/04/2019 | $9,000 |
| 04/05/2019 | $9,000 |
| 04/19/2019 | $9,000 |
| 04/22/2019 | $9,000 |
| Totals | $63,000 |

156.   **ESSER** also used drug proceeds derived from Target Account #1 to pay for his wife's 2016 BMW X6. According to Massachusetts DOT records, De Moraes Delesposti Vieira[57] purchased this BMW X6 on July 13, 2019, from Autobahn USA located in Westborough, Massachusetts. DOT records list the sales price as $40,295. At the time of purchase, De Moraes Delesposti Vieira traded in a 2016 Toyota Camry valued at $12,500.[58] This brought the amount owed for the 2016 BMW X6 down to $27,795. With taxes and other fees, this 2016 BMW X6 cost $34,234.19. On July 12, 2019,

---

[55] As previously stated in this affidavit, I believe that **ESSER** debited this cash from his account in separate increments of $9,000 for the purpose of avoiding currency reporting requirements.

[56] A review of a Car Fax Report associated with this vehicle revealed that when the vehicle was serviced on May 28, 2019, in North Attleboro, Massachusetts, the odometer reading was 30,227.

[57] DOT records refer to De Moraes Delesposti Vieira simply as "Regiane Vieira."

[58] This 2016 Toyota Camry trade-in vehicle was registered to Vieira (a/k/a De Moraes Delesposti Vieira).

**ESSER** used his debit card associated with Target Account #1 to pay Autobahn USA in the amount of $2,000.[59] On July 15, 2019, **ESSER** wrote a cashier's check in the amount of $34,234.19 (the remaining balance on this vehicle) to Autobahn USA. These funds were withdrawn from Target Account 1 on July 15, 2019. The chart below shows the payment made from Target Account 1 towards this vehicle:[60]

| Payments Towards 2016 BMW X6 | | | |
| --- | --- | --- | --- |
| Date | Payment | Payment Type | Recipient |
| 07/12/2019 | $2,000.00 | Debit Card | Autobahn USA |
| 07/15/2019 | $34,234.19 | Cashier's Check | Autobahn USA |
| Total | $36,234.19 | | |

157.    On February 4, 2020, while conducting research with the Massachusetts Registry of Motor Vehicles into any updated information pertaining to **ESSER** or Vieira-Esser, I observed that another vehicle was registered to Vieira-Esser, the gray 2015 Toyota Camry referenced in this affidavit. I inquired with the Registry of Motor Vehicles and determined that on December 26, 2019, **ESSER** sold this vehicle to Vieira-Esser for $3,000. There was no lien listed for the vehicle. The Registry listed the mileage as 68,244 at the time of this sale. The Registry also provided a copy of the vehicle's Certificate of Title, which listed **ESSER** as originally purchasing this vehicle for $8,000 on November 25, 2019. A review of Targett Account #1 reveals that **ESSER** made two

---

[59] Autobahn USA responded to a subpoena request for information concerning this sale of the BMW X6. According to Autobahn USA records, Esser signed for this partial payment of $2,000 made on 7/12/2019.

[60] At the time of the sale of this vehicle to De Moraes Delesposti Vieira, the mileage was listed as 26,355.

cash withdrawals of $9,000 each during the month of November totaling $18,000. However, there are no checks or other notations associated with this account regarding the purchase of the 2015 Toyota Camry.

158.    **ESSER** also used drug proceeds derived from Target Account #1 to help pay for **ALISON**'s 2016 black Nissan Rogue. According to Massachusetts DOT records, **ALISON** purchased this Nissan Rogue on February 4, 2019, from Car Max located in North Attleboro, Massachusetts for $23,003. **ALISON** paid $10,000 for this vehicle and financed the remainder of the purchase through Ally Financial. **ESSER**'s Target Account #1 shows that on February 4, 2019, **ESSER** wrote a check to Car Max in the amount of $7,000. As of October 28, 2019, Ally listed an outstanding balance on this vehicle of $10,333.13.[61]

*ESSER's Tax Returns*

159.    On October 28, 2019, an Ex Parte Order was signed by a Federal Magistrate Judge in the District of Rhode Island requesting the tax returns for David **ESSER** (2014-2018) and Esser Properties, LLC (2017-2018). On January 28, 2020, the documents were received from the Internal Revenue Service (IRS) at the United States Attorney's Office in the District of Rhode Island. On January 29, 2020, I reviewed the returns and return information for David **ESSER**. There were no federal income tax returns filed for Esser Properties, LLC.

---

[61] According to information received from CARFAX, as of June 27, 2019, the mileage listed for this vehicle was 20,082.

160.     In sum, **ESSER** did not report income that remotely accounted for the funds that I observed flowing into and out of his bank accounts.  Nor does it account for his spending. He appears to be concealing the income derived from steroid trafficking. In the past five years, the highest annual income he reported was under $40,000.  In the past two years, it was less than $10,000.

161.     In addition to **ESSER's** tax returns, the IRS also provided Information Returns Processing (IRP) documents which consist of reported payments made by third parties to **ESSER** and Esser Properties, LLC. I am aware from reviewing Target Account #1 that **ESSER** regularly used a processing and financial services company to receive payments from suspected steroid customers. However, in November of 2018, he discontinued his use of that company and began primarily using Zelle and cryptocurrency to receive his steroid payments. In reviewing the IRP documents, I observed that in 2017 and 2018 **ESSER** reportedly received payments from that processing and financial services company exceeding $350,000 that he likewise did not declare.

162.     The IRS also provided IRP documents pertaining to Esser Properties, LLC. A property management company, based in Lancaster, PA, was listed in two separate IRS 1099-MISC Form filings in 2018 and 2019 and reporting rental income to Esser Properties, LLC. of under $50,000.

163.     I am aware from working this investigation that **ESSER's** primary source of income is the proceeds that he earns from the illegal sale of steroids. He spends lavishly to buy cars, luxury goods and real estate. My review of **ESSER's** tax returns

revealed that his declared income is grossly inconsistent with his spending and the funds deposited into Target Account #1.

*Other Anonymous Tips*

164.    I have been informed by Mansfield Detective Lattanzio that, in addition to the aforementioned tip received by Mansfield Police in March of 2019 concerning **ESSER**'s suspected illegal activities, there have been several other tips submitted to police departments regarding **ESSER**'s illegal operation. Although the tips were anonymous the information was consistent with and corroborated by my long-term investigation and therefore appear to be reliable.

165.    The two separate tips about **ESSER** were submitted through an application called "My Police Department App." *My Police Department App* allows users to download the application onto smart phones and other devices and provides communication between the public and police departments, including a tip-line feature.

166.    The first tip was submitted on August 30, 2019 and appears to have been mistakenly received by the Attleboro, MA Police Department as opposed to North Attleboro Police. This tip, which does not list any information regarding the tipster, states the following:

> THIS PERSON RUNS GOLDLINE LABS. AN UNDERGROUND DRUG LAB THAT PRODUCES LARGE QUANTITIES OF DRUGS. HE TAKES ORDERS VIA EMAIL AND SHIPS HIS DRUGS THROUGH THE POSTAL SYSTEM. HE OWNS AND RUNS THIS FORUM: hardcore-underground.com<http://hardcore-underground.com> HIS AKA'S: GOLDLINE, Dred David M. Esser 145 Washington St North Attleboro, MA. 02760 Age 47 phone: (508) 643-0961 email: Thegoldline@protonmail.com.

167.    I know from working this investigation that **ESSER** uses 145 N. Washington Street, Apt 7, North Attleboro, MA to stash his supply of steroids and other narcotics. I also know from my own undercover communications with **ESSER**, that he uses the e-mail address of *Thegoldline@protonmail.com* listed in this tip.

168.    Even more recently On January 26, 2020, a second tip was sent using this same app to the Attleboro Police Department regarding **ESSER**.  The tip, which listed the sender only by a first name and e-mail address, stated the following:

> Dave has been selling steroids through his online website for over 5 years he stores his inventory in his second apartment which his ex wife Alison Esser goes and packages purchases. He keeps all information on his home computer and gets paid cash sent through the mail which his ex wife's boyfriend picks up for them.

169.    Although the sender of this tip has not yet been identified, I am aware from this investigation that **ESSER** works with **ALISON** and **MCLAUGHLIN** in the distribution of steroids. Both these tips further corroborate the information set forth in this affidavit regarding **ESSER**'s steroid trafficking operation.

*Esser's Newest Residence, Subject Premises #4*

170.    Throughout the course of this investigation I have gathered evidence of **ESSER**'s illegal trafficking activities conducted at his long-term residence (Subject Premises #1), his stash house (Subject Premises #2) and his PO Box (Subject Premises #3). Although **ESSER** has continued to use these three locations to conduct his criminal activity, I have become aware of a new residence associated with **ESSER**, Subject Premises #4.

171.     On February 4, 2020, while conducting a search of the current

registrations for **ESSER**'s main two vehicles, his 2019 Toyota Camry and 2017 Chevrolet

Corvette, I became aware that the address associated with these two vehicles had

changed from Subject Premises #1 to 74 Oakhurst Street, Unit A, North Attleboro, MA

(Subject Premises #4). This address is approximately one-half mile from Subject

Premises #1. [62]

172.     Based on this information, on February 4, 2020, I traveled to North

Attleboro and conducted physical surveillance at Subject Premises #4. On that date, at

approximately 7:00 pm, I observed a gray-colored Toyota Camry parked in the

driveway of the Subject Premises #4 bearing MA registration, 1BJE17. A search of law

enforcement databases reveals that this vehicle is registered to **ESSER**'s spouse, Regiane

Celi DELESPOSTI (DOB – 3/11/1987), of 9 Fisher Street, Apt 3, North Attleboro, MA.

173.     On this same date, I then conducted physical surveillance in the vicinity of

Subject Premises #2, **ESSER**'s known stash house. At approximately 7:05 pm, I

observed **ESSER**'s white Toyota Camry, parked directly across from the entrance to

Subject Premises #2 on N. Washington Street. I parked on N. Washington Street a short

distance from **ESSER**'s vehicle. At approximately 7:55 pm, I observed an individual I

believe to be **ESSER** exit 145 N. Washington Street and walk across the street and get

into the Camry. **ESSER**'s drove past me in the direction of Oakhurst Street. I traveled in

that same direction using a parallel street to avoid being observed by **ESSER**. I then

---

[62] Subject Premises #4 occupies the left half of one structure containing two separate residences, Unit A and Unit B. Each of the two units has their own separate driveway space on their respective sides of the building.

drove directly to 74 Oakhurst Street and observed that **ESSER**'s Camry was parked in the driveway of Subject Premises #4. The lights were on inside of this residence and Vieira-Esser's Toyota Camry was still parked in the driveway.

174.   On February 10, 2020, I again conducted physical surveillance of Target Premises #4. On this date, at approximately 10:00 am, I observed three vehicles parked in the driveway of the residence; **ESSER**'s 2019 white Toyota Camry; Vieira-Esser's black BMW i6 and **ALISON**'s 2016 black Nissan Rogue. On this same date, at approximately 11:00 am, I observed that the Nissan Rogue was no longer in the driveway of the Subject Premises #4. I then drove to the vicinity of the Subject Premises #1, exited my vehicle and walked past that residence and observed the Nissan Rogue parked in the rear parking space behind Subject Premises #1. I know that **ALISON** works for **ESSER** in the packaging and distribution of controlled substances. Based on the fact that I observed **ALISON**'s vehicle parked on the properties of both Target Premises #4 and Target Premises #1 leads me to believe that **ESSER** is using both locations in furtherance of his trafficking scheme.

175.   I contacted USPIS Inspector Brian Bukuras and inquired if **ESSER** had recently filed for a change of address with the USPS. According to Inspector Bukuras, as of February 11, 2020, **ESSER** had not filed or a change of address with the USPS. However, Inspector Bukuras did observe that on January 30, 2020, **ESSER** signed for a mail parcel that was addressed to him at the Subject Premises #4. Also, on February 6, 2020, **ESSER** received a mail parcel addressed to him at the Subject Premises #1 from a company called Victory Packaging, LP of Dayton, NJ. I conducted a web search for this

company and observed that they are a vendor of all types of packaging products such as shrink wrapping, flexible packaging and other custom packaging catering to business customers. I know from observing the trash discarded from Subject Premises #1 that **ESSER** uses packaging such as that described on this company's website to package his steroids from distribution.

176.    I also requested additional documents from BoA associated with Target Account #1 and #2. BoA responded to my request and provided me with, among other things, a copy of a check written by **ESSER** on January 11, 2020 in the amount of $7,500. This check was made out to "809 East Washington Street, LLC." A search of the Bristol County, MA online property assessing resources reveals that Target Premises #4 is owned by "809 East Washington Street LLC."[63] Furthermore, according to BoA records, **ESSER** wrote another check on January 11, 2020 to 809 East Washington Street, LLC in the amount of $1,000 with a note on the check stating, "Pet Deposit."

177.    While reviewing **ESSER**'s Target Account #1, I also observed that on January 14, 2020, **ESSER** spent over $13,000 at two furniture dealers and a window blind company. These payments were in the form of debit card purchases associated with Target Account #1. I believe that **ESSER** made these payments to furnish his new residence located at Subject Premises #4.

178.    On February 12, 2020, I learned from the North Attleboro Electric Company that **ESSER's** account is still active at Subject Premises #1 (9 Fisher St., Apt 3)

---

[63] 809 East Washington LLC is a business entity registered in the State of Massachusetts and owned by an individual from North Attleboro, MA who is currently unknown to this investigation.

in his name. It has not been cancelled. **ESSER** also established a new account at Subject

Premises #4 (74 Oakhurst St. Unit A) in his name. His first bill is due on March 6, 2020.

179.    Based on these observations, coupled with the fact that **ESSER** is still

receiving mail and paying the utility bills at Subject Premises #1, I believe that **ESSER** is

now maintaining two residences.  I therefore believe that evidence and proceeds of

these crimes as described herein will be found at both locations.


VII.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

180.    As further described in this affidavit and in Attachment B, this application

seeks permission to search for records, photographs, contacts, schedules, stored

communications and other evidence that might be found in data stored on a computer's

hard drive, mobile phones or other storage media. Thus, the warrant applied for would

authorize the seizure of electronic storage media or, potentially, the copying of

electronically stored information, all under Rule 41(e)(2)(B).

181.    I submit that if a computer or storage medium is found on the PREMISES,

there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

  a.   Based on my knowledge, training, and experience, I know that computer

       files or remnants of such files can be recovered months or even years after

       they have been downloaded onto a storage medium, deleted, or viewed

       via the Internet. Electronic files downloaded to a storage medium can be

       stored for years at little or no cost. Even when files have been deleted,

they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

f. Based on the evidence related to this investigation, I am aware that computer equipment was used to communicate, receive drug orders and payments, generate, record and store information in the drug trafficking scheme.

182.   Through my training, education, and experience — including my participation in this case and my review of reports and documents relating to it — I have learned that individuals who engage in these drug trafficking offenses often keep significant physical evidence, fruits, and instrumentalities of their crimes inside their residences, including, but not limited to, controlled substances, packaging material and packing inserts (from incoming cash deliveries), shipping labels (from incoming cash deliveries), ledgers reflecting transactions and funds laundered, financial transaction reports, customer and supplier lists, identification documents and records confirming residency, access devices relating to supplies and financial accounts (such as swipe cards to medical offices and credit and debit cards), detailed financial records, cash and tangible proceeds.

183.   I have also learned through training, education, and experience that such

evidence, fruits, and instrumentalities are often stored in locked containers, safes, secret compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls, and in other places intended to avoid detection by other people, including law enforcement.

184.     Finally, I know that the commission of the offenses in the manner set forth in this affidavit necessarily requires the use of computers, smart phones, tablets, or other computer devices and storage media for the perpetrator to access cryptocurrency exchanges and wallets, connect with customers and co-conspirators, and engage in transfers of digital currency. I have learned through training and experience that individuals who engage in these offenses in this way also commonly use such electronic devices to keep track of suppliers, customers and co-conspirators, keep records of illegal transactions and criminal proceeds, and store copies of online chats, emails, and other data. In addition, I know, based on training and experience, that perpetrators maintain copies of software programs and other applications to assist with their cryptocurrency activities, including, but not limited to, cryptocurrency client and wallet files, digital signature software and related authentication keys, as well as encryption software and related encryption keys. In such cases, I know that perpetrators often keep such electronic devices inside their homes.  In some cases, these devices can be as small as a postage stamp.   In the case of smart phones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks or protective sleeves.

185.     Because these crimes involved the use of cryptocurrency and encryption,

the items to be seized could be stored almost anywhere within the subject premises, in both physical and electronic formats. For example, Attachment B seeks cryptocurrency addresses, private keys, recovery seeds, PGP keys, and passwords. These pieces of data comprise long and complex character strings, and in my training and experience I know that many cryptocurrency users write down or otherwise record and store such items because they are too long to commit to memory. As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence.

186.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the subject premises because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals,

the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can

record information about how the files were created and the sequence in

which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other

electronic storage media may provide crucial evidence of the "who, what,

why, when, where, and how" of the criminal conduct under investigation,

thus enabling the United States to establish and prove each element or

alternatively, to exclude the innocent from further suspicion. In my

training and experience, information stored within a computer or storage

media (e.g., registry information, communications, images and movies,

transactional information, records of session times and durations, internet

history, and anti-virus, spyware, and malware detection programs) can

indicate who has used or controlled the computer or storage media. This

"user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence. The existence

or absence of anti-virus, spyware, and malware detection programs may

indicate whether the computer was remotely accessed, thus inculpating or

exculpating the computer owner. Further, computer and storage media

activity can indicate how and when the computer or storage media was

accessed or used. For example, as described herein, computers typically

116

contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of

guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the

presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

187.    I know that when an individual uses a computer unlawfully to manage the transfer and storage of Bitcoin and other cryptocurrencies, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

188.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true

because of the following:

189.    *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

190.    *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

191.    *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

192. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it

193. *Previewing the electronic evidence.*  The search teams will include, where practicable, a forensic examiner who can preview the electronic evidence on site.  This will permit searching agents to be selective in what electronic evidence is seized to minimize disruption and it will prevent the loss or destruction of evidence, particularly the cryptocurrency which is uniquely susceptible to being transferred remotely by electronic means.

194. *Unlocking the device(s) with biometric features.* The warrant I am applying for would permit law enforcement to compel certain individuals to unlock a device subject to seizure pursuant to this warrant using the device's biometric features. I seek this authority based on the following:

    a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers,

that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then

analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a

device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

195.    As discussed in this affidavit, and based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

196.    I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through

a biometric feature may exist for only a short time.

197.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of the Target Offenders to the fingerprint scanner of the device(s) found at the premises or seized incident to the Target Offenders' arrests; (2) hold the device(s) found at the premises or seized incident to the Target Offenders' arrests in front of the face of the Target Offenders and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises or seized incident to the Target Offenders' arrests in front of the face of the Target Offenders and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## VIII.    CONCLUSION

198.    I therefore submit that there is probable cause to believe that David Esser, Mason Nieves, James McLaughlin and Alison Esser, a/k/a Alison Shepard have committed violations of 21 U.S.C. § 841(a)(1) (Manufacturing and Distributing a Controlled Substance), 21 U.S.C. § 846 (Conspiracy to Distribute a Controlled Substance), 21 U.S.C. § 952 (Importation of Controlled Substances), 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and Services); 18 U.S.C § 545 (Smuggling Goods Into the United States); 18 U.S.C. § 371 (Conspiracy); and 18 U.S.C. § 1343 (Wire Fraud), 18

U.S.C. §§ 1956 and 1957 (Money Laundering).

199.     I also submit that there is probable cause to search the Subject Premises described in Attachment A for the evidence described in Attachment B.

200.     I also submit that there is probable cause to seize the funds held in the Target Accounts described in Attachment C and the motor vehicles described in Attachment D, as they constitute property derived from proceeds obtained, directly or indirectly, from violations of 21 U.S.C. §§ 841, 846 and 952 (Controlled Substance Offenses), 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and Services), 18 U.S.C § 545 (Smuggling Goods Into the United States), and/or property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of violations of 18 U.S.C. §§ 841, 846 952 (Controlled Substance Offenses), 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and Services), and/or property involved in violations of 18 U.S.C. §§ 1956-1957 (Money Laundering),  and therefore are subject to forfeiture pursuant to 21 U.S.C. § 853(a) (criminal forfeiture of proceeds and facilitating property for controlled substance offenses), 21 U.S.C. § 881(a) (civil forfeiture of proceeds and facilitating property for controlled substance offenses), and 18 U.S.C. § 982(a)(1)-(2) (criminal forfeiture of proceeds for smuggling goods, wire fraud, and money laundering offenses), 18 U.S.C. § 981(a)(1)(C)-(D) (civil forfeiture of proceeds in importation of controlled substance, smuggling goods, money laundering, and wire fraud offenses), 18 U.S.C. § 2323 (criminal and civil forfeiture of proceeds facilitating property for trafficking counterfeit goods), and 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(A) (criminal and civil forfeiture of property involved in money laundering offenses).

126

201.    From my consultations with assistant U.S. attorneys, I am aware that

federal court decisions have defined property that is involved in a money laundering

offense, and hence forfeitable under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(A), to include

three categories of proceeds: (1) the proceeds of specified unlawful activity (SUA) that

were the subject of a money laundering transaction; (2) funds that were commingled

with SUA proceeds at the time of the money laundering transaction; and (3) in money

laundering concealment crimes, 18 U.S.C. § 1956(a)(1)(B)(ii), funds that were

commingled with SUA proceeds, irrespective of whether the commingled funds were

part of a money laundering transaction. I am advised that among these decisions are

*United States v. Huber*, 404 F.3d 1047 (8th Cir. 2005); *United States v. Real Property Known*

*as 1700 Duncanville Road*, 90 F. Supp.2d 737, 741 (N.D. Tex 2000), aff'd, 250 F.3d 738 (5th

Cir. 2001) (Table); *United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248, 252

(E.D. Va. 1993); and *United States v. All Monies*, 754 F. Supp. 1467, 1475-76 (D. Hawaii

1991).

202.    By reason of the foregoing, there is probable cause to believe that the

funds held in the Target Accounts described in Attachment C and the motor vehicles

described in Attachment D constitute property involved in a money laundering offense,

18 U.S.C. §§ 1956 and 1957, or property traceable to such property, and therefore, are

subject to forfeiture pursuant to 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C).

203.    There is also probable cause to believe that a restraining order under 21

U.S.C. § 853(e) may not be sufficient to assure the availability of the Target Accounts for

forfeiture. I know from my training and experience that once their unlawful activities

restraining order but still in the custody of the investigative targets will not assure their

availability for forfeiture.


BRENDAN CULLEN
Special Agent
Homeland Security
Investigations



Subscribed and sworn to before me
on February 14, 2020

LINCOLN D. ALMOND
UNITED STATES MAGISTRATE JUDGE

129

**ATTACHMENT A**

**Property to Be Searched (Subject Premises #1)**

The residence located at 9 Fisher Street, Apartment 3, North Attleboro, MA 02760 is an apartment located in a two-story apartment building.  The residence has white vinyl siding on most of the structure and brick located on the first floor in the front of the building. The numbers 9-11 are white in color and displayed horizontally on the black awning located above the front door.  The front door is painted red in color and faces north towards the street.  In addition to the front entrance, there is also a rear entrance to the building that faces a small parking lot located directly behind the building.



1

**ATTACHMENT A (Cont.)**

**Property to Be Searched (Subject Premises #2)**

The residence located at 145 North Washington Street, Apartment 7, North Attleboro, MA 02760 is an apartment located in a two-story apartment building.  The residence has a brick façade in front and white vinyl siding on the rear and sides of the structure. The numbers 145 is displayed horizontally just above the front door.  The front door has a large glass window pane and the remainder of the door is painted green in color and faces west towards the street.  In addition to the front entrance, there is also a rear entrance to the building that faces a small parking lot located directly behind the building facing the Subject Premises 1 on Fisher Street.



2

## ATTACHMENT A (Cont.)

### Property to Be Searched (Subject Premises #3)

The Post Office Box 620 is located at 12 Giles Place, Mansfield, MA 02048-0620, the Mansfield, MA Post Office.  This is an individual Post Office box and rented by David ESSER.



3

**ATTACHMENT A (Cont.)**

**Property to Be Searched (Subject Premises #4)**

The residence located at 74 Oakhurst Street, Unit A, North Attleboro, MA 02760 is newly constructed townhouse. Unit A occupies the left half of the building which consists of two separate residences, Unit A and Unit B. Each of the two units has their own separate driveway space on their respective sides of the building. The façade is gray with white trim and the front entrance is a white door that is visible from the street. The residence also has a built-in garage with a garage door located to the left of the front door of the residence.



4

## ATTACHMENT B

### Items to be Seized

The items to be searched for, seized, and examined, are those items on the premises and curtilage, located at, The Subject Premises and referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(l), 846, 952(a) and 18 US.C. § 545.  The items to be seized cover the period of June 1, 2018, through the date of the execution of the search warrant.

The items referenced above to be searched for, seized, and examined are as follows:

a.      All controlled substances, held in violation of 21 U.S.C. § 841(a)(1);

b.      Financial profits, proceeds and instrumentalities of trafficking in narcotics and money laundering, including U.S. currency, Cryptocurrencies, Digital Asset Tokens, and other items of value;

c.      Any and all cryptocurrency, to include the following:

1.      any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

2.      any and all representations of cryptocurrency private keys, whether in electronic or physical format;

3.      any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

4.      The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

5.      The United States is further authorized to copy any wallet files and restore them onto computers controlled by the United States. By restoring the wallets on its own computers, the United States will continue to collect cryptocurrency transferred into the defendant's wallets as a result of transactions that were not yet completed at the time that the defendant's devices were seized.

d.      Digital currency hardware wallets, digital offline storage devices, Mnemonic phrases, passwords, encryption keys and seed recovery lists;

e.      Paraphernalia for packaging, smuggling, processing, diluting, manufacturing, weighing, and distributing controlled substances, for example: hidden compartments, scales, blenders, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, heat sealing devices, pill presses, and dilutants such as inositol, vitamin B12, etc.;

f.      Books, USPS priority mail records, UPS records, receipts, notes, ledgers, and other documents relating to the manufacture, importation and distribution of controlled substances; money laundering, communications between members of the conspiracy, and evidence of the use of apparently legitimate businesses to disguise profits;

g.      Mail parcels, letters, envelopes and boxes addressed to Post Office Box 620, Mansfield, MA 02048;

h.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the manufacture, importation and distribution of controlled substances, and money laundering;

6

    i.       International shipping records, receipts, bills of laden.;

    j.       Financial records relating to controlled substances income and expenditures of money and wealth, to wit: money orders, wire transfer records, cashier's checks and receipts, account records, passbooks, tax records, safe deposit box keys and records, checkbooks, and check registers, as well precious metals and gems such as gold, silver, diamonds, etc.;

    k.       Items of personal property purchased using proceeds from the sale of controlled substances, to include high value items such as jewelry, clothing, footwear, hand bags, and other accessories;

    l.       Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises, including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys;

    m.       Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rent a car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

    n.       Mobile devices, to include cellular telephones.

    o.       Any computer, electronic storage medium (such as flash memory or other media that can store data), or digital devices that contains or in which is stored records, digital currencies or information. The term "computer" includes all types of electronic, magnetic,

7

optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media. The devices may be accessed and copied or mirrored.

      p.    Passwords, encryption keys, recovery seeds, GPG or PGP encryption keys, GnuPG keyrings, and other access devices, applications and programs that may be necessary to access encrypted storage accounts, communications and digital currency storage.

      q.    Documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the Computer.

      r.    Routers, modems, and network equipment used to connect computers to the Internet.

      s.    Latent prints and identifying material from items at the Subject Premises.

## ATTACHMENT C

### Bank of America Accounts

| ACCOUNT NAME | Bank | ACCOUNT NUMBER(S) |
|---|---|---|
| David M Esser | BoA | 004605550100 (Target Account #1) |
| Esser Properties, LLC | BoA | 466001029446 (Target Account #2) |
| Mason Angel Nieves | BoA | 394008833040 (Target Account #3) |
| Regiane Moraes Delespoti | BoA | 004661366833 (Target Account #4) |
| Ana P. Menezes | BoA | 009494092144 (Target Account #5) |
| Ana P. Menezes | BoA | 466006229775 (Target Account #6) |

1. The contents of the Target Accounts shall consist of all principal, deposits, interest, dividends, and other amounts credited to the account on and after execution of the warrant up to final liquidation of the account.

2. Homeland Security Investigations (HSI) is authorized, without further order of the Court, to effect the seizure of the contents of the account by, in its discretion, directing the financial institution at which the account is established to do any of the following:

   a) To freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than HSI Special Agents, and while any contents of the account are frozen in place to accrue any deposits, interest, dividends, and any other amount credited to the account for a period of up to sixty days from the date of seizure and until HSI Special Agents direct that the contents of the account be finally liquidated and no contents remain;

   b) To liquidate some or all of the contents of the account at one or more times at the direction of HSI Special Agents and upon any such liquidation of any contents to turn over the liquidated amount to HSI or their designee. Any such direction of HSI shall be deemed to be the direction of the Court under this warrant.

9

**ATTACHMENT D**

**Vehicles to be Seized**

1. A blue 2017 Chevrolet Corvette, registered to David M. Esser, Date of Birth: xx/xx/1973, 74 Oakhurst Street, Unit A, North Attleborough, MA 02760, bearing MA registration 1DAA34 and Vehicle Identification Number (VIN) 1G1YH2D78H5110011;

2. A white 2019 Toyota Camry, registered to David M Esser, Date of Birth: xx/xx/1973, 74 Oakhurst Street, Unit A, North Attleborough, MA 02760, bearing MA registration 6GW891 and VIN 4T1BZ1HK2KU024687;

3. A black 2016 BMW X6 SUV, registered to Regiane Vieira, Date of Birth xx/xx/1987, 9 Fisher Street, Apt 3, North Attleborough, MA 02760, bearing MA registration 9EX366 and VIN 5UXKU2C55G0N83531;

4. A black 2016 Nissan Rogue registered to Alison R. Esser, Date of Birth: xx/xx/1979. 4 Towne Street, North Attleborough, MA 02760, bearing MA registration 47A170 and VIN 5N1AT2MVXGC744674;

5. A gray 2015 Toyota Camry registered to Regiane Celi Delesposti, Date of Birth: xx/xx/1987, 9 Fisher Street, Apt 3, North Attleborough, MA 02760, bearing MA registration 1BJE17 and VIN 4T4BF1FKXFR508033.

10